253 U.S. 97
 40 S.Ct. 504
 64 L.Ed. 801
 CHICAGO, M. & ST. P. RY. CO.
v.
McCAULL-DINSMORE CO.
 No. 628.
 Argued and Submitted April 23, 1920.
 Decided May 17, 1920.
 
 Mr. O. W. Dynes, of Chicago, Ill., for petitioner.
 Mr. J. O. P. Wheelwright, of Minneapolis, Minn., for respondent.
 Mr. Justice HOLMES delivered the opinion of the Court.
 
 
 1
 This is an action for the loss of grain belonging to the plaintiff and delivered on November 17, 1915, to the defendant, the petitioner, in Montana, for transportation to Omaha, Nebraska. The grain was shipped under the uniform bill of lading, part of the tariffs filed with the Interstate Commerce Commission, by which it was provided that 'the amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property at the place and time of shipment under this bill of lading, including freight charges, if paid.' The petitioner has paid $1,200.48, being the amount of the loss so computed, but the value of the grain at the place of destination at the time when it should have been delivered, with interest, less freight charges, was $1,422.11. The plaintiff claimed the difference between the two sums of the ground that the Cummins Amendment to the Interstate Commerce Act made the above stipulation void. The District Court gave judgment for the plaintiff, 252 Fed. 664, and the judgment was affirmed by the Circuit Court of Appeals. 260 Fed. 835.
 
 
 2
 The Cummins Amendment Act of March 4, 1915, c. 176, 38 Stat. 1196 (Comp. St. § 8604a), provides that the carriers affected by the Act shall issue a bill of lading and shall be liable to the lawful holder of it 'for any loss, damage, or injury to such property * * * and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier * * * from the liability hereby imposed' and further that the carrier 'shall be liable * * * for the full actual loss, damage, or injury * * * notwithstanding any limitation of liability or limitation of the amount or recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void.' Before the passage of this amendment the Interstate Commerce Commission had upheld the clause in the bill of lading as in no way limiting the carriers' liability to less than the value of the goods, but merely offering the most convenient way of finding the value. Shaffer v. Chicago, Rock Island & Pacific Ry. Co., 21 I. C. C. 8, 12. In a subsequent report upon the amendment it considered that the clause was still valid and not forbidden by the law. 33 I. C. C. 682, 693. The argument for the petitioner suggests that courts are bound by the Commission's determination that the rule is a reasonable one. But the question is of the meaning of a statute and upon that, of course, the courts must decide for themselves.
 
 
 3
 We appreciate the convenience of the stipulation in the bill of lading and the arguments urged in its favor. We understand that it does not necessarily prevent a recovery of the full actual loss, and that it the price of wheat had gone down the carrier might have had to pay more under this contract than by the common law rule. But the question is how the contract operates upon this case. In this case it does prevent a recovery of the full actual loss, if it is enforced. The rule of the common law is not an arbitrary fiat but an embodiment of the plain fact that the actual loss caused by breach of a contract is the loss of what the contractee would have had if the contract had been performed, less the proper deductions, which have been made and are not in question here. It seems to us, therefore, that the decision below was right, and as, in our opinion, the conclusion is required by the statute, neither the convenience of the clause, nor any argument based upon the history of the statute or upon the policy of the later Act of August 9, 1916, c. 301, 39 Stat. 441 (Comp. St. §§ 8592, 8604a) can prevail against what we understand to be the meaning of the words. Those words seem not only to indicate a broad general purpose but to apply specifically to this very case.
 
 
 4
 Judgment affirmed.
 
 
 5
 The Chief Justice dissents for the reasons stated by the Interstate Commerce Commission.
 
 
 6
 Note.—The following is the report of the Interstate Commerce Commission, as found in 33 Interst. Com. Com'n R. 683: By the Commission:
 
 
 7
 For many years, if not, indeed, from the origin of railroad transportation in this country, common carriers by railroad have sought, by provisions in shipping contracts, bills of lading, tariff publications, etc., to limit their common-law liability, not only as insurers against loss or damage to property received by them for transportation, but also as tort-feasors for loss or damage caused by their negligence. One method was by a so-called release, executed by shipper and carrier, and intended to be effective, whether the loss or damage was due to negligence of the carrier or to other causes. The courts in different jurisdictions have differed as to the validity of such limitations and they have been the subject of legislation in some of the states.
 
 
 8
 By adoption of the Carmack Amendment, so called, to the act to regulate commerce, approved June 29, 1906, the Congress provided that a common carrier receiving property for transportation from a point in one state to a point in another state should issue a receipt or bill of lading therefor and be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier to which such property might be delivered, or over whose lines such property might pass, and declared that no contract, receipt, rule, or regulation should exempt such common carrier from the liability thereby imposed. It was provided that nothing in that amendment should deprive any holder of such receipt or bill of lading of any remedy or right of action which he had at that time under existing law.
 
 
 9
 Since that time, beginning in 1913, with Adams Express Co. v. Croninger, 226 U. S. 491, the Supreme Court of the United States has decided in a number of cases, all of which followed Hart v. P. R. R., 112 U. S. 331, that where the shipper has his choice of two rates, the higher carrying unlimited carrier's liability, and in 'a fair, just, and reasonable agreement' declares or agrees that the value of his shipment is a certain sum, and thereby secures a reduced transportation rate, he is bound by that declaration or agreement, estopped from claiming or recovering more than that value in case of loss of or damage to the property, and conclusively presumed to have known the governing tariff.
 
 
 10
 On March 4, 1915, the following act, amendatory of the act to regulate commerce, and hereinafter called the Cummins Amendment, was approved:
 
 
 11
 'Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that so much of section seven of an act entitled 'An act to amend an act entitled 'An act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, and all acts amendatory thereof, and to enlarge the powers of the Interstate Commerce Commission,' approved June w enty-ninth, nineteen hundred and six, as reads as follows, to wit:
 
 
 12
 "That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or a bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law,' be, and the same is hereby, amended so as to read as follows, to wit:
 
 
 13
 "That any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one state or territory or the District of Columbia to a point in another state, territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one state, territory, or the District of Columbia to a point in another state or territory, or from a point in a state or territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a territory shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: Provided, however, that if the goods are hidden from view by wrapping, boxing, or other means, and the carrier is not notified as to the character of the goods, the carrier may require the shipper to specifically state in writing the value of the goods, and the carrier shall not be liable beyond the amount so specifically stated, in which case the Interstate Commerce Commission may establish and maintain rates for transportation, dependent upon the value of the property shipped as specifically stated in writing by the shipper. Such rates shall be published as are other rate schedules: Provided further, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: Provided further, that it shall be unlawful for n y such common carrier to provide by rule, contract, regulation, or otherwise a shorter period for giving notice of claims than ninety days and for the filing of claims for a shorter period than four months, and for the institution of suits than two years: Provided, however, that if the loss, damage, or injury complained of was due to delay or damage while being loaded or unloaded, or damaged in transit by carelessness or negligence, then no notice of claim nor filing of claim shall be required as a condition precedent to recovery.'
 
 
 14
 'Sec. 2. That this act shall take effect and be in force from ninety days after its passage.'
 
 
 15
 Many widely varying or diametrically opposed ideas have been expressed as to the effect of this amendment and as to what will be the lawful rates under present tariffs when it becomes effective on June 2, 1915. The commission has been urged to some expression in the premises. It has held a hearing on this subject, and the questions there discussed have been argued on briefs. From the best information it has been possible to obtain and the consideration it has been possible to give this matter within the limited time available, the commission expresses tentatively the views hereinafter indicated.
 
 
 16
 The greater part of the freight transported moves under a bill of lading, which constitutes a receipt for the property and a contract for its carriage. Efforts have been made from time to time to secure the adoption and use by all carriers of a uniform bill of lading, but no such effort has been entirely successful. Several years ago protracted effort of that kind, assisted in so far as seemed appropriate by the commission, culminated in substantial agreement among the representatives of the shippers and the representatives of the carriers, excepting those in the Southern classification territory, as to the terms and conditions of what was then styled and has since been known as the uniform bill of lading. The commission gave its tentative approval and recommended its use, and since that time it has been in use except in the Southern territory mentioned, where a somewhat different bill of lading, commonly called the standard bill of lading, has been and is in use.
 
 
 17
 The official classification, which, speaking generally, applies in the territory east of the Mississippi river and north of the Ohio and Potomac rivers, contains a rule that, except as otherwise provided, when property is transported subject to the provisions of that classification the acceptance and use of the uniform bill of lading, export bill of lading, uniform live stock contract, and certain contracts with men in charge of shipments, respectively, are required. The uniform bill of lading and the other bills of lading or contracts are set out in full in the classification.
 
 
 18
 Another rule is that in order that the consignor may have the option of shipping subject to the terms and conditions of the uniform bill of lading, or under the liability imposed upon common carriers by the common law and the federal and state statutes applicable thereto, different rates and different forms of bills of lading are provided, to be used at the election of the shipper. Under this rule, unless it is otherwise provided in the classification, property will be carried at the lower rates specified if shipped subject to all the terms and conditions of the uniform bill of lading. Property carried not subject to all the terms and conditions of the uniform bill of lading is to be carried at the carrier's liability, limited only as provided by common law and by the laws of the United States and of the several states in so far as they apply, but subject to the terms and conditions of the uniform bill of lading in so far as they are not inconsistent with such common carrier's liability, and in such instances a rate 10 per cent. higher, subject to a minimum increase of 1 cent per 100 pounds, will be charged. It is provided that if consignor elects not to accept all the terms and conditions of the uniform bill of lading he shall so notify the agent of the carre r at the time his property is delivered for shipment, and if he does not give such notice it will be understood that he desires the property carried subject to the terms and conditions of the uniform bill of lading in order to secure the lower rate or, as it is termed in the classification, 'the reduced rate.' If the shipper notifies the agent of the initial carrier that he elects not to accept all the terms and conditions of the uniform bill of lading, the agent must print, write, or stamp upon the bill of lading a provision that in consideration of the higher rate charged the property will be carried at the carrier's liability, limited only as provided by law, but subject to the terms and conditions of the uniform bill of lading in so far as they are not inconsistent with such common carrier's liability.
 
 
 19
 The Western classification, which, speaking generally, applies in all of the territory west of the Mississippi river and Lake Michigan, contains a rule that, except as otherwise provided therein, when property is transported subject to the provisions of the Western classification the acceptance and use of the uniform bill of lading is required. It also contains additional provisions substantially like those cited from the official classification. All of the terms of the uniform bill of lading are printed in the classification, but the live stock contract form does not so appear. The live stock ratings are stated to be based upon values declared by shippers, not exceeding certain stated values 'under contract.'
 
 
 20
 The Southern classification, which, speaking in general, applies in the territory east of the Mississippi and south of the Ohio and Potomac rivers, contains a rule that the reduced rates specified in the classification will apply only on property shipped subject to the conditions of the carrier's bill of lading, and that property carried not subject to the conditions of the carrier's bill of lading will be at the carrier's liability, limited only as provided by common law and by the laws of the United States and of the several states in so far as they apply. It provides that property thus carried will be charged 10 per cent. higher, subject to a minimum increase of 1 cent per 100 pounds, than if shipped subject to the conditions of the carrier's bill of lading. The classification does not contain the terms of the carrier's bill of lading, and, with one or two individual exceptions, the terms thereof are not filed with the commission as a tariff publication or rate schedule. The classification provides that the rates on live stock will apply when the declared value does not exceed certain values therein stated and that for each increase of 100 per cent. Or fraction thereof in the declared value there shall be an increase of 20 per cent. in the rate. The classification does not contain any requirement that the live stock contract must be used, but it does provide that agents must not issue more than one live stock contract on any one shipment. Some of the tariffs of the individual carriers in this territory contain released rates applicable to shipments of live stock which are conditioned upon certain declared valuations and upon shipments being made under the live stock contract, and such tariffs provide that higher rates will apply when shipments are not so made. The terms of the live stock contract are not incorporated in the tariffs and, with one or two individual exceptions, they are not filed with the commission as a tariff publication.
 
 
 21
 It is perfectly plain that the purpose of this law is, except as otherwise provided therein, to invalidate all limitations of carrier's liability for loss, damage, or injury to property transported caused by the initial carrier or by another carrier to which it may be delivered or which may participate in transporting it. The law does not specifically say that attempts so to limit the carrier's liability shall not be resorted to but it declares them to be invalid and unlawful wherever found and in whatever guise they may appear. Obviously, therefore, neither the bil § of lading or other contracts for carriage, or classifications or rate schedules of the carriers, should contain any provisions which are so declared to be unlawful and void.
 
 
 22
 Some of the carriers insist that if no changes are made in their classifications and other tariff publications the lower rates, which are conditioned upon the use of the bills of lading now in use, will be automatically canceled and the higher rates, based upon the carrier's liability, will be the only lawful rates from and after the date upon which the law in question becomes effective. Some of the shippers insist that if no changes are made in the classifications or tariff publications, the provisions for limitation of carrier's liability will, when the new law becomes effective, be unlawful and void, and the carriers will thereupon have two sets of rates, both applicable under like conditions, and that of the two shippers will be entitled to the lower.
 
 
 23
 The official classification roads have announced the purpose of making certain changes in the terms of their bill of lading, other contracts of carriage, and classification and rate schedules, in the light of the provisions of the new law. They say that whether or not they will continue to maintain rates based upon the value of the property is a matter for further consideration by their traffic officers. They express the opinion that certain of these changes will impose upon them liabilities not heretofore borne and consequent loss of revenue, and reserve the right to assert at the proper time a claim for some increase in rates on account thereof.
 
 
 24
 The Southern lines announced their purpose of making certain changes in their contracts, classification, and rate schedules which would exempt certain heavy commodities moving in large quantities and said to constitute about 70 per cent. of their traffic from any immediate increases in rates on account of the amended law, and to incorporate in the classification a provision that as to the remainder of the traffic the rates contained in schedules governed by the classification would be increased 5 per cent. upon the date when the new law becomes effective. That method of changing rates would be in direct opposition to the commission's regulations governing the construction of tariffs, which are by the act given full force of law. The Southern lines urge that the new law will produce conditions which furnish substantial reasons for allowing them additional revenue, and that it is physically impossible, except by the method which they propose, to issue any tariff publications prior to June 2 which will secure that additional revenue. They say that the tariff regulations are prescribed by the commission, and that it is within its power to modify them at any time, and therefore the question of whether or not the carriers should be permitted to make effective the proposed plan is wholly within the commission's discretion to determine. They argue that if nothing is done the 10 per cent. higher rates will automatically become effective, which they do not desire, and that the course proposed by them is the only alternative to the injustice of their being compelled to sustain the burdens imposed by the new legislation without means for recouping the losses which they will suffer.
 
 
 25
 The commission has made no investigation upon which a judgment as to the cost of and proper compensation for additional risk could be based. The commission has no right to assume that it would be 5 per cent. of the rates upon 30 per cent. of the carriers' traffic, or that it would be any given per cent. Upon all of the traffic. Obviously there can be no propriety in attaching to one commodity unreasonable rates for the purpose of compensating a carrier for a risk attaching to it in the transportation of another commodity, and it is admitted that the carriers cannot make any accurate statement in advance as to the added cost, if any, of the increased liability.
 
 
 26
 With regard to rates on shipments of live stock, the Southern carriers announced at the hearing their purpose to provide that the present rates would apply on shipments declared to be of value not exceeding that now stated as limitation of the carrier's liability, and to increase the rates 20 per cent. for each 100 per cent. increase in the declared value of the live stock. By letter submitted since the hearing they announce the purpose to provide for an increase of 5 per cent. in the rate for each increase of 100 per cent., or fraction thereof, in the declared value.
 
 
 27
 By a still later letter the Southern classification roads advise that, in view of the numerous and irreconcilable complications which have developed, and in order to remove all doubt as to the continuance of existing rates after the amendment to the law becomes effective, they have decided to supersede their present classification rule by one which will recite that the rates governed by the classification will apply only on property shipped subject to the conditions of the carrier's bill of lading in use on and after the effective date of the amended law, and, except as otherwise provided in the classification, all interstate rates in effect on June 2, 1915, will continue in force, disregarding provisions in tariffs, classifications, and exception sheets which limit the liability of carriers, and to continue a provision that property carried not subject to the terms and conditions of the carriers' bill of lading will be at carriers' liability, limited only by the common law and the laws of the United States and of the several states, in so far as they may apply, and property so carried will be subject to rates 10 per cent. higher than those shown in the tariffs.
 
 
 28
 The Western classification roads, in the main, take a position substantially like that taken by the official classification roads. Their representatives expressed to the committees of Congress the view that the enactment of the amendment in question would, by striking from the uniform bill of lading vital provisions, automatically throw the roads back upon their common-law liability and the increased rates. They admit that a 10 per cent. increase in rates cannot be justified. They think that the increased liability will justify some increase in rates, but emphatically disclaim any disposition to take advantage of a technical opportunity to mulct the shipping public. They are of opinion that they still have the right to provide rates upon live stock dependent upon the declared value of the stock, and that a shipper who misstates the true value of his shipment is guilty of violation of section 10 of the act, just as he would be if he misstated the commodity shipped. They suggest that their present rule, which provides in general for an increase of 10 per cent. in the rate for each 100 per cent. of increase in the declared valuation, is probably too high; that an increase of 5 per cent. in the rate for each 100 per cent. increase in the value, or of 3 per cent. in the rate for each increase of 50 per cent. in the value, would be a more equitable rule, and that this question is involved in a case soon to be submitted to the commission. They, like the Eastern roads, have numerous commodity rates based upon valuation, and they think they may lawfully continue that practice. They have, however, not had opportunity since this bill was enacted to formulate in detail the changes which they think necessary and proper.
 
 
 29
 From the best information that can be gathered from testimony that has been submitted in various cases, it appears that prior to 1913 the limited liability provisions contained in the shipping contracts, classifications, and rate schedules were very generally disregarded in the settlement of loss and damage claims, especially in the Western classification territory. It seems, therefore, that to a very large extent at least, despite the limitations of liability stated in the contracts and schedules, full value was quite generally recognized in the settlement of claims. After the Supreme Court decided the Croninger Case, supra, in 1913, the provisions of the contracts and rat schedules in this and other particulars were recognized as lawfully binding upon carriers and shippers alike, and the policy followed was correspondingly changed. It is pointed out that prior to 1906 many of these limitations of liability were not contained in the shipping contracts and rate schedules; that in 1906 they were incorporated therein, but were largely ignored until 1913; that in 1913 the policy was generally adopted of endeavoring to enforce the limited liability provisions; and that neither in 1906 nor in 1913 was say change in the rates undertaken because of the limited liability. It is argued that, inasmuch as no reduction in rates was made when the limited liability provisions were established, or when they were sustained as lawful by the Supreme Court of the United States, there is no justification for an increase in rates now that the liability conditions are restored to substantially what they were prior to 1906. Limitations of liabibility have been incorporated in live stock shipment contracts for many years, but, as has been said, it appears that at least in the territory where there is the greatest movement of live stock those limitations were generally disregarded in settlement of claims.
 
 
 30
 The so-called uniform bill of lading, which has been in use in official and Western classification territories, contains, and has contained, a provision that claims for loss or damage must be presented to the carrier within four months, but until the Croninger Case, supra, was decided by the Supreme Court no effort was made by the carriers generally to enforce or to observe that provision. After the Croninger Case was decided the carriers adopted an entirely different course, and took the position that this provision was in the bill of lading, the terms of the bill of lading were in the rate schedules, and therefore it was unlawful to depart from that requirement. This created a general controversy, and the sudden change from ignoring a rule to literally enforcing it necessarily created multitudes of unjust discriminations. The question was presented to and considered by the commission, and as the fair and only means of composing the situation and avoiding endless controversy and litigation the commission issued its report. In the Matter of Bills of Lading, 29 I. C. C. 417.
 
 
 31
 The Cummins Amendment makes it unlawful for the carrier to fix a period for giving notice of claims shorter than 90 days, for the filing of claims shorter than 4 months, and for the institution of suits shorter than 2 years. The law does not indicate the time or date from which these several periods of time shall be computed; that is, whether from the date of delivery by the carrier of the damaged property, or, in case of loss, after a reasonable time for delivery has elapsed, from the date shown on the bill of lading, or from the occurrence of the loss or of the damage. It seems clear that these provisions are, in common with the other matters governed by the amendment, confined to instances of loss, damage, or injury caused by the carriers. It will be necessary for the carriers to determine what periods of time they will fix for giving notice of claims, the filing of claims, and the institution of suits. The dates or times from which such periods shall run should also be fixed in the rules. In the interest of thorough understandings and to avoid controversies, it is very desirable that these rules be uniform for all the carriers of the country.
 
 
 32
 It is to be remembered that the Cummins Amendment is not a separate statute, but is an amendment to the act. It must therefore be construed as a part of, and in connection with other portions of, the act, and in such a way as to give effect to the whole statute. There does not seem to be any indication of legislative intent to change any provision of the act other than that part known as the Carmack Amendment. The new amendment should, if possible, be so construed as to give full force to its clear purpose, without impairing the effect of any other provision of the ac.
 
 
 33
 The more important points, which seem to be surrounded with the most doubt and upon which opinions so far expressed most sharply conflict, are:
 
 
 34
 1. If no changes are made in the existing shipping contracts and rate schedules, will the higher rates provided therein automatically become lawfully applicable upon the date upon which the amendment takes effect?
 
 
 35
 As we have seen, the Carmack Amendment, adopted in 1906, provided that no contract, receipt, rule, or regulation should exempt the carrier from the liability thereby imposed. As has been said, no effort was made to change rates because of that amendment to the act. The classifications or rate schedules provide that unless the terms of certain bills of lading are accepted higher rates will apply. The terms of the bill of lading could be modified or changed to any extent without automatically changing any rate. Prior to 1913 many of the limitations contained in bills of lading or other shipping contracts were treated as if they did not exist, and it was never suggested that the validity or invalidity of any such provision affected the rate.
 
 
 36
 It is contrary to all canons of construction to hold that an act of Congress produces a result not intended by Congress unless the express language of the act compels such a construction. There is nothing in the expressed terms of this act, or in the history of this legislation, that shows any intent or purpose on the part of Congress to affect in any degree the existing rates charged by carriers for transporting property. The legislation is aimed at specified contracts and declares them to be unlawful. The lawful rates on file at this time, therefore, are the rates providing for the limited liability. The Cummins Amendment, by making contracts limiting liability for loss caused by the carriers unlawful, does not destroy these rates, but they remain in effect and are lawfully applicable, for the 10 per cent. increased rates are merely additional and cannot stand in and of themselves.
 
 
 37
 Applying correct rules of interpretation, the Cummins Amendment does not automatically bring into effect the increased rates named in the classifications and tariff publications as applicable to shipments which are not made subject to the terms of the uniform or carrier's bill of lading.
 
 
 38
 2. May the carriers lawfully provide in their tariffs and rate schedules that their liability shall be for the full value of the property at the time and place of shipment?
 
 
 39
 It is argued that such a provision would be neither a limitation of the amount of recovery nor a representation or agreement as to value within the meaning of the new law. It is urged that this rule would relieve the question of the amount of liability from uncertainty, would afford a reasonable and uniform method of determining the measure of recovery, save endless litigation, with its attendant labor and expense, and avoid unjust discriminations.
 
 
 40
 The Cummins Amendment clearly places upon the carriers liability for the full actual loss, damage, or injury to the property transported which is caused by them, and it makes unlawful any limitation of that liability, or of the amount of recovery thereunder, in any receipt, bill of lading, contract, rule, regulation, or tariff filed with this commission, without respect to the manner or form in which such limitation is sought to be made. The loss or damage must, apparently, be either as of the time and place of shipment, time and place of loss or damage, or time and place of destination. Where rates are lawfully dependent upon declared values, the property and the rates are classified according to the character of the property, of which the value of the property may constitute an element, and such classification is necessarily as of the time and place of shipment. It is therefore believed that the liability of the carrier may be limited to the full value of the property so classified and established as of the time and place of shipment.
 
 
 41
 3. Does the amendment to the act apply to export and import shipments to and from foreign countries not adjacent to the United States?
 
 
 42
 This must be answered in the negative, in view of the fact that, while specifically stating that its terms shall apply to property received for transportation from certain points to certain other points, it makes no reference to shipments from a point in the United States to a point in a nonadjacent foreign country, or from a nonadjacent foreign country to a point in the United States.
 
 
 43
 4. In the proviso, 'that if the goods are hidden from view by wrapping, boxing, or other means, and the carrier is not notified as to the character of the goods,' what is the proper interpretation to be placed upon the words 'and the carrier is not notified as to the character of the goods'?
 
 
 44
 Some argue that the word 'character' means nothing more than a statement of the ordinary name by which the commodity is known. On the other hand, it is urged that knowledge as to what the commodity is is necessary in order to apply to it any transportation rate, and that therefore the word 'character' properly means more than the mere name of the commodity. It has been suggested that the real and proper meaning would be indicated by recasting the language as follows:
 
 
 45
 'Provided, however, that if a commodity in the course of transportation is hidden from view by wrapping, boxing, or other means, so that the carrier cannot know its character, that is to say, its grade, quality, and condition, it may, with the approval of the commission, publish and maintain rates based on value and require the shipper to state in writing the value of any shipment made, and beyond the value so stated the carrier shall not be liable.'
 
 
 46
 It has also been suggested that, in view of the fact that the articles dealt with in this proviso are to be distinguished on the basis of value, the value becomes a peculiar quality of the property, and the word 'character' should be construed as including value, and that when the shipper notifies the carrier of the character of the goods the notice is incomplete, unless the value is stated as a necessary element in pointing out the character of the goods.
 
 
 47
 Another suggestion is that when common experience or knowledge does not clearly establish the nature of the goods, or the view is hidden by boxing, wrapping, or other means, and the carrier is not notified as to the true character of the goods, it may exercise the right to require the shipper to state in writing the value of the property.
 
 
 48
 The right of the carrier to initiate its rates and to consider value of the property tendered for transportation as an element in determining the classification thereof or the rate applicable thereto has not been denied by the act or withdrawn by this amendment. The right in certain instances to make varying rates upon a given article or commodity dependent upon its true value being recognized, and it being impossible for the carrier's agent to know the true value of the shipment unless it is declared by the shipper, and in view of the fact that the ordinary name of the commodity is essential to the application of any transportation rate whatsoever, it seems that the word 'character' as used in this proviso must include the true and actual value as stated by the shipper.
 
 
 49
 The word 'character' as here used clearly relates primarily to value, or to those qualities affecting value, and when the entire proviso is considered the meaning seems to be that if the qualities affecting value of the goods are hidden from the carrier's view, or are not known to the carrier, the proviso applies. It is a well-settled rule of statutory construction that the word 'and' may be read as 'or' in deference to the meaning of the context.
 
 
 50
 If the word 'and' in the proviso is read as 'or,' the meaning is reasonably clear; whereas, if the letter of the statute is adhered to, the meaning is doubtful and difficult to determine. In those instances in which the carrier desires to limit its liability to the value of the property as specifically stated in writing by the shipper, the rate must be basd upon the declared value and be so published; but the commission apparently must determine in advance of such publication that the commodity is one the value of which cannot be known to the carrier from ordinary sources or reasonable inspection, and to which rates based on declared value may be applied in connection with which the carrier's liability is limited to the value so declared.
 
 
 51
 In determining that question the inquiry is whether or not the commodity is one the value of which is peculiarly within the knowledge of the shipper. If it has a definite market value, or its value depends upon facts of which the carrier has equal knowledge with the shipper, the 'character' of the shipment is known to the carrier, and the proviso does not apply. The Congress did not affirmatively recognize any rates based upon declared value other than those authorized by this proviso. This, of course, does not mean that commodities may not be reasonably classified according to value and be subject to different rates applicable to different grades of the same commodity, which is a different matter from limiting the liability to the declared value.
 
 
 52
 When the goods are not hidden from view, and the carrier is advised as to their character, all contracts or agreements purporting to limit the liability of the carrier for loss or damage caused by it are made void. A carrier, after the Cummins Amendment goes into effect, may not contract to limit its liability for loss or damage caused by it to the property. There is, however, no inhibition as to the limitation of the liability of a carrier for losses not caused by it or a succeeding carrier to which the property may be delivered. The amendment has expressly reapplied the limitation of the prior act with respect to loss or damage caused by the carriers chargeable t t therewith. It follows, therefore, that the interpretation applied to the act before it was amended is equally applicable to the amendment in so far as the latter affects the right of a carrier to establish rates conditional upon the shipper's assumption of the entire risk of loss attributable to causes beyond the carrier's control. From this it follows that under the amendment a contract o a tariff may lawfully limit to a reasonable maximum the liability of a carrie for losses which it does not cause. It follows further that the rates provided by such tariff may be proportionate to the risk assumed.
 
 
 53
 This provision of the statute as to goods concealed carrier is not advised clearly prescribes the right carrier is not advised clearly prescribes the right of carriers under the direction or approval of the commission to provide for a graduation of rates in accordance with the declared value of the property transported. The liability provided by the rates so established by the commission is applicable no less to instances of loss or damage chargeable to the negligence of the carrier than to those occasioned by causes beyond the carrier's control. But the carriers may not contract to limit their liability for loss, damage, or injury caused by them to property the character of which is manifested by the shipment itself or otherwise disclosed.
 
 
 54
 In this connection it has been suggested that the carrier might provide that in the event the shipper refused to declare the value the higher rates would apply. This suggestion cannot be approved. If the rate is lawfully conditioned upon the value as declared by the shipper, it is as much the shipper's duty to declare the true value of the shipment as it is his duty to declare the name of a commodity tendered for shipment as to which there are no different rates.
 
 
 55
 It is important to keep in mind that the carriers are not prohibited from making different rates dependent upon the value of different grades of a given commodity; that, except as covered by the Cummins Amendment, including approval of the rates by the commission, the carrier is subject to all of the liabilities imposed by that amendment; and that if, in any instance, the shipper declares the value to be less than the true vl ue in order to get a lower rate than that to which he would otherwise be entitled, he violates, and is subject to the penalty prescribed in, section 10 of the act. The carrier would also be subject to the same penalty in such a case if, having knowledge that the value represented is not the true value, it nevertheless accepts the shipper's representation as to value for the purpose of applying the rate.
 
 
 56
 5. Do the terms of the Cummins Amendment apply to the transportation of baggage?
 
 
 57
 This must apparently be answered in the affirmative. Transportation of baggage is a part of the contract for transportation of the passenger. The carriers have always limited their liability for loss of or damage to baggage. The baggage check is the carrier's receipt for the baggage. The conditions attached to the carrier's liability are stated in the fare schedules and on passage tickets of contract form. In National Baggage Committee v. A. T. & S. F. Ry. Co., 32 I. C. C. 152, the commission considered the carriers' rules relative to charges and liabilities in the transportation of baggage and prescribed certain reasonable regulations, including reasonable insurance charges upon baggage declared to be of greater value than the maximum limit provided in the schedules and contract for carriage. All ordinary personal or sample baggage is hidden from view by boxing, wrapping, or other means, and the amended law seems clearly to recognize the carrier's right to fix conditions and terms applicable to the transportation of baggage dependent upon the value as declared by the person offering the baggage for transportation.
 
 
 58
 The necessity for revision of the bills of lading, live stock contracts, and other similar contracts of carriage, as well as of certain parts of the carriers' classifications and rate schedules, is manifest. Bills of lading and shipping contracts can and ought to be at once amended by eliminating obviously unlawful and invalid provisions. Such action will obviate for the immediate future numerous controversies that otherwise would properly arise. Proper analysis should be made of the classifications and tariffs to bring them into harmony with the amended law.
 
 
 59
 Such changes in classifications and rate schedules cannot be made upon statutory notice and become effective contemporaneously with the new law. Permission is therefore hereby given to carriers to make effective on June 2, 1915, upon not less than three days' notice to the public and to the commission, given in the manner prescribed in the act and in the commission's
 
 
 60
 regulations, amendments to the classifications and rate schedules which eliminate provisions or rules that are in conflict with the terms of the new law, provided no such amendment has the effect of increasing any rate or charge for services.
 
 
 61
 If, in a proper manner and a proper proceeding, it shall be made to appear that, with regard to any commodity or commodities, the existing rates do not afford the carriers proper compensation for the services they perform and the risk which is imposed upon them, it could hardly be denied that the rates on such commodities might properly be increased in a sufficient amount to properly compensate the carriers for their added risk and liability. Where rates are lawfully based upon declared values, the difference in rates should be no more than fairly and reasonably represents the added insurance. It does not appear that this amendment to the act affords justification for any increase in rates on commodities in general. As has been said, the carrier may not lawfully impose unreasonable rates upon one commodity in order to compensate it for risk or liabilities incurred in connection with the transportation of another commodity, and it is not to be forgotten that the liabilities here considered are only those for loss, damage, or injury to the property caused by a carrier or its agents or employes; in other words, the loss, damage, or injury resulting from the neglects or omissions of a carrier or its agents.
 
 
 62
 The commission has been cod ucting an investigation with regard to bills of lading, entitled In the Matter of Bills of Lading, Docket No. 4844. Further hearings in that proceeding may be necessary in the light of the Cummins Amendment. In that connection matters that have been informally presented and urged in this informal proceeding may be presented in a formal way, supported by testimony, and a determination can there be reached on questions as to which the commission now has no information upon which it could base a lawful order. What is attempted here is simply to indicate the impressions gained from the experience had in the past and from the suggestions informally presented by those who are vitally interested in the effect of the Cummins Amendment and the course to be pursued for the immediate future in the light thereof. All of the questions herein discussed are, of course, subject to judicial interpretation, and the views indicated herein might be somewhat changed in the light of more complete information supported by competent evidence.
 
 
 63
 The classification, tariffs, receipt and other forms used by the express companies have been prescribed by order of the commission. The new law, of course, applies to them as well as to other carriers. They have presented suggested changes in their rules and forms which will be disposed of by a supplemental order in the Express Case.