**PHILIPS CONSUMER ELECTRONICS COMPANY, Plaintiff,**

v.

**ARROW CARRIER CORPORATION, Defendant,**

**and**

**Royal Insurance Company of America, Intervenor.**

**No. 91 Civ. 1555 (RWS).**

United States District Court, S.D. New York.

Feb. 26, 1992.

**438**

Leon Rock, Woodbury, for plaintiff.

Marcigliano & Campise (Eileen D. Stier, of counsel), New York City, for defendant.

Schindel, Cooper & Farman (Jean M. Gardner, of counsel), New York City, for intervenor.

## OPINION

SWEET, District Judge.

Plaintiff Philips Consumer Electronics Company ("Philips") commenced this action against the Arrow Carrier Corporation ("Arrow") for wrongful conversion and for breach of contract. Philips has now moved for summary judgment on its claims against Arrow. Intervenor Royal Insurance Company of America ("Royal") has moved for summary judgment against Philips declaring that Arrow's liability to Philips is not a covered loss under the insurance policies issued by Royal to Arrow. Philips has cross-moved for summary judgment against Royal seeking to recover against the policies. For the following reasons, Philips's motion is granted; Royal's motion is granted; and Philips's cross-motion is denied. Philips's additional motion seeking an order permitting it to amend its complaint to add a cause of action against Kemper Insurance Company is granted.

### The Parties

Philips is a division of North American Philips Corporation, a corporation organized and existing under the laws of the State of Delaware with offices in Knoxville, Tennessee. Philips manufactures electronic equipment, including camcorders.

Arrow is a motor common carrier in interstate commerce subject to the provisions of the Interstate Commerce Act and the regulations of the Interstate Commerce Commission. Arrow is a corporation organized and existing under the laws of the State of New Jersey with a principal place of business in New Jersey. In addition to operating as a common carrier, Arrow also provided distribution services for its customers which involved the receipting of truckload shipments at its main terminal in North Bergen, New Jersey and disbursal as directed by its customers to various consignees. Philips was a regular customer of Arrow's and also utilized Arrow's distribution services for delivery of electronic equipment to designated consignees.

On or about December 14, 1989, Arrow filed for bankruptcy under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. As a result of the bankruptcy filing, all actions and/or claims against Arrow were stayed pursuant to 11 U.S.C. § 362. Philips obtained a consent order modifying the stay so as to permit it to institute this suit against Arrow so that it could then proceed to recover against Arrow's insurance carrier.

Royal is an Illinois stock company with a principal place of business in North Carolina. Royal provided insurance coverage to Arrow.

### The Facts

The following facts are undisputed. On August 21, 1989, Philips delivered to Arrow a full shipment of 718 cartons of camcorders, which Arrow was to transport to a consignee in New York State. Arrow interlined the goods to its Newburgh, New York terminal and made delivery on August 22, 1989. At destination on that date, the receiving clerk for the consignee acknowledged receipt of the shipment as full and without exceptions. It was later discovered, however, that the delivery was in fact short by 432 cartons. The invoice value of the 432 cartons short at destination was $387,763.20.

The undelivered cartons were returned to an Arrow terminal in Newburgh, New York, where they remained until the last week of August. Arrow then shipped the freight back to its central distribution terminal in North Bergen, New Jersey. There, they were placed in a secured area of the dock, where high value cargo generally was held. Arrow's senior officials, Anthony Matarazzo ("Matarazzo"), the President, and Nathan Connizzo ("Connizzo"), the Assistant to the President and Vice–President of Safety and Insurance, were aware that the camcorders were being held in the North Bergen facility. Attempts were made to determine whether there was a shortage in any shipments against which the overage could be applied. The inquiries revealed that all shipments had been made in full.

According to Connizzo's deposition testimony, the normal procedure when unclaimed cargo is held at an Arrow facility is to notify the shipper that the cargo is in Arrow's possession. It is undisputed that Arrow did not advise Philips that Arrow was in possession of 432 camcorders which it could not apply to any shortage in other shipments. According to Connizzo, the cartons were clearly labeled.

Approximately seven to ten days later, Matarazzo directed that the camcorders be moved from the secured facility and placed in a trailer that held cargo to be salvaged. Sometime during the first week of September 1989, Matarazzo decided to sell the 432 cartons as salvage. Connizzo arranged for the sale, although he knew that Arrow was not entitled to sell the camcorders. The sale took place in three installments for which Arrow received $180,000 in cash. No attempt was made to notify Philips prior to the sale.

Philips discovered the shortage when it received a warranty from someone who had purchased a camcorder, bearing a serial number that identified it as part of the shipment in question, in New York City. Since that shipment of camcorders was to be delivered to a consignee near Newburgh, New York, the receipt of the warranty indicating purchase in New York City triggered an investigation, by the Federal Bureau of Investigation and others, to determine whether there had been a theft from the consignee's warehouse. Connizzo received a telephone call from the state police, and, according to his deposition testimony, then realized that the 432 camcorders were a shortage in the shipment to that consignee.

By a series of letters to Philips, Arrow accepted responsibility for the shortage and agreed to entertain a claim from Philips for the wholesale invoice price of the 432 cartons of camcorders, to be paid in a series of installments. *See* Letter from N. Connizzo to B. McKenzie, Claims Manager of Philips, Sept. 20, 1989 (acknowledging responsibility); Letter from E. Schatz, Claims Manager of Arrow, to B. McKenzie, Oct. 20, 1989 (agreeing to reimburse Philips in the amount of $387,763.20 over eight months); Letter from J. Gordon, Sen. Vice Pres. of Arrow, to B. McKenzie, Nov. 15, 1989 (accepting responsibility for loss). The terms of this arrangement were not accepted and finalized between the parties prior to the filing of the bankruptcy petition, and Arrow has made no payments.

Royal issued a commercial marine policy to Arrow covering the period from January 13, 1989 to January 13, 1990 (the "Policy").[1] The Policy consists of two separate types of coverage: a Truckers Cargo Comprehensive Coverage Form ("Cargo Form") and a Transportation Comprehensive Coverage Form ("Shipper's Interest Form"). The issue to be resolved in determining Royal's motion and Philips's cross-motion is whether the loss of the camcorders is covered under the Policy.

*Discussion*

The Second Circuit has recently re-articulated the well-known standard to be applied in determining motions for summary judgment.

> Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a

---

**1.** Commercial Inland Marine Policy No. N QF  00 15 99–R. *See* Royal Ex. A.

matter of law. Fed.R.Civ.P. 56(c). "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." However, where the non-moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim. *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (citations omitted). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); *see also Bay*, 936 F.2d at 116.

To defeat a motion for summary judgment, the party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts" as to issues on which the moving party has carried its burden or those on which the non-moving party bears the burden of proof. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Rather, he must establish the existence of enough evidence such that a jury could return a verdict in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–51, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986).

I. *Philips's Motion for Summary Judgment against Arrow*

■ The liability of a common carrier for loss or damage to goods transported in interstate commerce is governed by federal law. *Adams Express Co. v. Croninger*, 226 U.S. 491, 504–06, 33 S.Ct. 148, 151–52, 57 L.Ed. 314 (1913); *Eastman Kodak Co. v. Johnson Motor Lines, Inc.*, 123 A.D.2d 515, 516, 507 N.Y.S.2d 565, 566 (4th Dept. 1986). Thus, although jurisdiction over this case is predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332, the rule of decision is drawn from the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 11707 (1991 Rev.Supp.), which governs cargo loss and damage by regulated interstate motor carriers. *See U.S. JVC Corp. v. New England Motor Freight, Inc.*, 1990 WL 115621, No. 89 Civ. 3039 (JFK), slip op. at 1 (Aug. 7, 1990).

The Carmack Amendment provides in relevant part that:

> A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission.... [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the *actual loss or injury to the property* ....

49 U.S.C. § 11707(a)(1) (emphasis added).

It is undisputed that Arrow is a common carrier in interstate commerce subject to the Interstate Commerce Act and that Arrow is liable for the loss of the camcorders. Arrow contends, however, that summary judgment cannot be granted because material questions of fact remain as to the "actual loss" sustained by Philips, claiming that the invoice value at destination is not the appropriate measure of "actual loss."

■ The traditional measure of "actual loss" is the difference between the market value of the property if it had been delivered according to the contract specifications and the market value of the nonconforming goods. *See, e.g., Chicago, M & St. Paul Ry. Co. v. McCaull–Dinsmore Co.*, 253 U.S. 97, 40 S.Ct. 504, 64 L.Ed. 801 (1920); *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir.1991) (citing *McCaull–Dinsmore*); *Contempo Metal Furniture, Co. v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761, 764 (9th Cir.1981); *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 351 (1st Cir.1973). The theory is that, generally, mere replacement costs "deprive a manufacturer of expected profit which he is on the verge of earning and do not compensate him for what he would have

had if the contract had been performed." *Polaroid*, 484 F.2d at 351.

■ An exception to this general rule does exist, however, under which the replacement cost is the appropriate measure of damages. In *Illinois Cent. R.R. Co. v. Crail*, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699 (1930), the Supreme Court ruled that:

[the market value measure] may be discarded and other more accurate means resorted to if, *for special reasons*, it is not exact or otherwise not applicable.

*Id.* at 64–65, 50 S.Ct. at 181 (emphasis added), *quoted in Eastman Kodak*, 949 F.2d at 319. In that case, the plaintiff, a coal dealer, purchased a carload of coal, the shipment of which was delivered short of 5,500 pounds. At the time of delivery, the plaintiff had not resold any of the coal and the shortage did not interfere with the maintenance of his usual stock. He was able to purchase coal of like quality at a wholesale price of $5.50 per ton. The retail market price was $13 per ton. The Supreme Court held that the retail market price was not the appropriate measure of damages because:

in the actual circumstances the cost of replacing the exact shortage at retail price was not the measure of the loss, since it was capable of replacement, and was, in fact, replaced in the course of respondent's business from purchases made in carload lots at wholesale market price without added expense.

*Id.*, 281 U.S. at 63, 50 S.Ct. at 181.

■ The burden of proof is on the carrier, Arrow, to show that "special reasons" exist such that application of the market value rule will not result in a just measure of actual damages. *Eastman Kodak Co. v. Westway Motor Freight*, 751 F.Supp. 1481, 1484 (D.Colo.1990); *Gold Star Meat Co. v. Union Pac. Railroad Co.*, 438 F.2d 1270 (10th Cir.1971). Courts have found that "special reasons" exist that render the market value rule inapplicable where the shipper can replace the shipment at cost and suffers no loss of profit. *Brockway–Smith Co. v. Boston and Maine Corp.*, 497 F.Supp. 814, 821 & n. 12, 823 (D.Mass. 1980); *H. Daroff & Sons, Inc. v. Strick-*

*land Transp. Co., Inc.*, 284 F.Supp. 510 (E.D.Pa.1968); *Meletio Sea Food Co. v. Gordons Transports, Inc.*, 191 S.W.2d 983 (Mo.App.1946). The rationale is that the shipper has received the profit and thus should not be accorded more than full compensation for the loss it sustained. At least one court has found that this exception is not relevant, however, where the goods are stolen, as opposed to destroyed, because they "compete with the manufacturer and, therefore, no true replacement is possible." *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d at 351 (goods hijacked).

In other cases, "special reasons" have not been found to have been sufficiently established. In *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349 (1st Cir. 1973), a shipment of Polaroid cameras was hijacked while entrusted to the defendant. The First Circuit affirmed the district court's finding on summary judgment that the dealer price was the proper measure of damages where the defendant did not contest plaintiff's affidavits attesting to the dealer price of each item, the costs saved by non-delivery and facts supporting the assumption that the items in the stolen shipment would have been sold within a relatively short period. *Id.* at 350. In *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317 (10th Cir.1991), the Tenth Circuit held that the defendant had not sufficiently established "special reasons" even where affidavits showed that the shipper quickly replaced the damaged goods, and lost neither customers nor sales. The court reasoned that "these assertions—even taken in the light most favorable to Westway—fail to show that Kodak could not have sold and earned profit on two batches of unharmed product." *Id.* at 319–20. The court thus held that the full invoice price was the correct measure of damages since the carrier presented no evidence that the merchandise would have been sold at a lower price.

■ Arrow has not contested the invoice price as the market value of the camcorders at destination. Nevertheless, Arrow maintains that this is an inappropriate mea-

sure of damages because Philips "[u]pon information and belief, ... was able to and did replace the non-delivered portion of the subject shipment to its customer without loss of profit and is not entitled to same," and would therefore be unjustly enriched by an award including a profit component. Stier Aff. ¶ 12. This allegation is made, however, without any facts to support it. Although discovery is now complete, no evidence has been presented that shows that Philips was indeed able to replace the camcorders at cost; that the consignee indeed did purchase them at the same price or greater; or that, were it not for the loss, Philips would not have been able to earn a profit on the lost goods as well as the replacement goods, as in *Polaroid*. Lacking such affirmative evidence, Arrow has failed to carry its burden of establishing that "special circumstances" warrant a departure from the general rule.[2] Philips's motion for summary judgment is therefore granted.

## II. *Royal's Motion for Summary Judgment*

Royal has moved for summary judgment declaring that it is not liable under the Policy for the loss of the camcorders because it was caused by the "dishonest acts" of Arrow or its employees, the coverage of which is excluded under the Policy.

### A. Choice of Law

As a preliminary matter, it must be determined which law to apply in interpreting the coverage of the Policy. Federal courts sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New York law requires courts to apply the law of the jurisdiction "which has the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y.

155, 160, 124 N.E.2d 99 (1954); *see also Fleet Messenger Serv., Inc. v. Life Ins. Co.*, 315 F.2d 593, 596 (2d Cir.1963) (applying *Auten* to insurance contract); *Olin Corp. v. Insurance Co. of North Am.*, 743 F.Supp. 1044, 1048 (S.D.N.Y.1990). In cases involving insurance contracts, important factors considered by New York courts in making this determination include the "location of the insured risk, residence of the parties, and where the contract was issued and negotiated." *Avondale Indus., Inc. v. Travelers Indemnity Co.*, 774 F.Supp. 1416, 1423 (S.D.N.Y.1991) (quoting *Munzer v. St. Paul Fire & Marine Ins. Co.*, 145 A.D.2d 193, 200–01, 538 N.Y.S.2d 633, 637 (3d Dept.1989)); *see also Olin*, 743 F.Supp. at 1049.

In this case, the "location of the risk" obviously moved as Arrow moved in its business in interstate commerce. Arrow's "residence" as a corporation was New Jersey, and the Policy was executed in New Jersey. Because New Jersey therefore has the most significant contacts with matters concerning the Policy the law of that State that shall be applied.[3]

### B. Applicability of the "Dishonest Acts" Exclusion

Royal maintains that the Policy's explicit exclusion for losses resulting from the dishonest acts of Arrow or its employees applies to this loss and warrants summary judgment in its favor against Philips. The Cargo Form provides that:

We do not cover your liability for "loss" caused by or resulting from: ... Dishonest acts by you, anyone else with an interest in the property, your or their employees or authorized representatives or anyone entrusted with the property whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

---

**2.** Moreover, there is no reason to defer ruling on the issue of damages because Arrow has not submitted affidavits in conformity with Rule 56(f), which provides that:

Should it appear *from the affidavits of a party opposing the motion* that the party cannot for reasons stated present by affirmative facts

essential to justify the party's opposition, the court may refuse the application ... or may order a continuance to permit affidavits to be obtained or depositions to be taken....

**3.** It should also be noted that Philips has not contested the application of New Jersey law.

Cargo Form, ¶ B(1)(d), Royal Ex. A. Philips contends, on the other hand, that summary judgment is inappropriate because genuine issues of material fact exist as to whether the "dishonest acts" exclusion applies to Arrow and as to whether Arrow had the requisite intent in selling the camcorders to make it a "dishonest act."

Philips points out that the Policy actually contains *two* "dishonest acts" exclusions. In addition to the one cited above, a second one appears in the Shipper's Interest Form, which provides:

> We will not pay for a "loss" caused by or resulting from: ... Dishonest acts by you, anyone else with an interest in the property, your or their employees or authorized representatives or anyone entrusted with the property whether or not acting alone or in collusion with other persons or occurring during the hours of employment.
> *But this exclusion does not apply to a carrier for hire.*

Philips thus argues that the Policy is ambiguous as to which exclusion was intended to apply creating a genuine issue of material fact that precludes summary judgment.

■ Under New Jersey law, one of the "cardinal rules applicable in the interpretation of insurance contracts" is that "ambiguities are resolved in favor of the insured." *Del Vecchio v. Old Reliable Fire Ins. Co.*, 132 N.J.Super. 589, 592, 334 A.2d 394, 396 (1975). Obviously, for this rule to apply, there must in the first place be an ambiguity. Otherwise, where the terms of an insurance policy are clear and unambiguous, it should be enforced as drafted. *Longobardi v. Chubb Ins. Co.*, 121 N.J. 530, 582 A.2d 1257 (1990). This is especially true when that interpretation accords with the reasonable expectations of the insured. *Meier v. New Jersey Life Ins. Co.*, 101 N.J. 597, 612, 503 A.2d 862, 869 (1986).

■ The appearance of the "dishonest acts" exclusion at two points in the Policy does not create an ambiguity, because coverage under the Shipper's Interest Form and under the Cargo Form is mutually exclusive, and only the latter applies to the loss at issue here. The Shipper's Interest Form, whose language Philips cites as raising the ambiguity, specifically provides that "[w]e do not cover ... [p]roperty you accept while acting as a common or contract carrier; or as a bailee for hire." Royal Ex. A, Shipper's Interest Form ¶ 2.f. Coverage for losses while acting as a common carrier exists under the Cargo Form, however, which provides that "[w]e cover: Property of others described in the Declarations [General Freight] *while in your care as a carrier.*" *Id.*, Cargo Form ¶ A.1. Unlike the Shipper's Interest Form, the Cargo Form does not make the "dishonest acts" exclusion inapplicable to common carriers.

Arrow apparently knew that it was receiving two distinct forms of coverage under the Policy, because the Declarations page clearly segregates them. Therefore, the existence of the two differing exclusions does not create an ambiguity. Plainly, within the four corners of the Cargo Form, there is no doubt that the exclusion applies to common carriers.

Furthermore, Philips has presented no evidence that the Policy's coverage was ambiguous between the parties to the contract. Rather, the factual submissions suggest that the applicability of the exclusion to Arrow accords with the reasonable expectations of the insured. *Meier*, 101 N.J. at 612, 503 A.2d at 869. At his deposition, Connizzo, Arrow's Vice-President of *Insurance*, testified that he did not contact any insurance carrier regarding this loss because:

> I don't think that would be legal.... Not after we had sold the freight, knowingly sold the freight. I would not want to be the person to make the decision to submit a claim to the insurance company over this.

Royal Ex. D at 32.

C. Application of the "Dishonest Acts" Exclusion to the Loss of the Camcorders

The second "cardinal rule" applicable in interpreting insurance contracts is that "exclusionary clauses are to be strictly in-

terpreted.... As long as plaintiff's interpretation is reasonable, the exclusionary clause should be inapplicable." *Del Vecchio*, 132 N.J.Super. at 592, 334 A.2d at 396. Philips claims that because the term "dishonest acts" is not defined in the Policy, its meaning, as intended by the parties, is ambiguous and that therefore a question of fact remains for the jury as to whether Arrow had the intent required for a dishonest act. Royal does not contest the assertion that the exclusion requires some type of wrongful act and would have no application in the case of simple negligence, but maintains that the evidence submitted establishes that there is no factual question that Arrow's conduct constituted a "dishonest act."

■ A dishonest act is proven by a showing of moral turpitude, lack of probity, integrity, or trustworthiness. *Reese Cadillac Corp. v. Glens Falls Ins. Co.*, 59 N.J.Super. 118, 157 A.2d 331, 338 (App.Div. 1960); *cf. Mortgage Corp. of N.J. v. Aetna Casualty & Surety Co.*, 19 N.J. 30, 36, 115 A.2d 43, 46 (1955) ("dishonesty" in fidelity bond evidences "clear intent to protect employer against employees' wrongful acts which, though not criminal, nevertheless display significant lack of probity, integrity or trustworthiness.").

Philips asserts that issues of fact exist as to whether the parties intended "dishonest acts" to include conversion, whether "that term under the policy calls for a lesser standard than a criminal act," Rock Aff. ¶ 5, and finally as to whether Arrow converted the goods with the wrongful intent to deprive Philips of its property. Philips states that there is no question that the acts do not amount to a criminal act because, despite investigation by state and federal law enforcement authorities, neither Arrow nor the participants have been arrested, indicted or convicted for the sale of the camcorders.

Acts of theft have been held to fall under "dishonest act" exclusions. In *Cordin Motor Freight, Inc. v. Allstate Ins. Co.*, 58 Ill.App.3d 585, 16 Ill.Dec. 152, 163, 374 N.E.2d 927, 938 (1st Dist.1978), an Illinois appellate court affirmed the district court's finding on summary judgment that theft by an owner-operator of the insured's equipment was "clear[ly] and unambiguous[ly]" an act of "infidelity or dishonest[y] of the insured or of the insured's employees or of any owner-operator hired by the insured" excluded by the policy and thus outside the scope of its coverage. Similarly, in *Georgia Carpet Express, Inc. v. Travelers Indemnity Co.*, 148 Ga.App. 603, 252 S.E.2d 17 (1979), a Georgia court held that a loss resulting from the theft of certain cargo by a truck driver to whom the insured had entrusted the goods fell within an exclusion for losses resulting from "dishonesty or infidelity, wrongful conversion, misappropriation, embezzlement or secretion of the property ... by any one in the immediate employment or service of the insured or by persons to whom he described property may be entrusted." *Id.* at 603, 252 S.E.2d at 18–19.

■ The factual submissions leave no doubt that Arrow's salvage sale of the 432 camcorders constituted an act of dishonesty under any definition. Connizzo's unrefuted deposition testimony establishes that Arrow knew that the camcorders belonged to Philips and yet knowingly sold them for salvage without contacting Philips.

Although Arrow tried to ascertain whether there had been any shortages in deliveries to which the overage applied, it made no effort at any time to notify Philips that it was in possession of the 432 camcorders or that they were going to be sold as salvage. Royal Ex. D at 15, 26. Yet, based on Connizzo's testimony, it is apparent that Arrow knew that Philips was the shipper and rightful owner of the merchandise. Connizzo testified, for example, that "[a]ll the deliveries that were traced by *Philips Electronics* were found to be full deliveries with no shortages," *id.* (emphasis added); that "I am sure there was no question about [who owned the camcorders], each box was very plainly labeled," *id.* at 18; and that "[i]t was sold at the direction of Tony Matarazzo and *we knew* what was being sold at the time of the sale." *Id.* at 29 (emphasis added).

Philips contends that these facts are not dispositive on the dishonesty question for a number of reasons. First, Arrow contends that there is "nothing devious or dishonest, in and of itself, for the president of a trucking company to order the sale of salvage freight," Rock Aff. ¶ 9, and that "the freight sold as salvage never belongs to the carrier. This is true as to all salvage freight sold by a common carrier. It is always freight placed into the hands of a carrier by a shipper." *Id.* ¶ 10. Furthermore, Arrow argues that Connizzo's testimony that *he* did not believe Arrow was entitled to sell the camcorders as salvage merely expresses his individual opinion, and he admitted that he was not the one who made the decision as to when any freight would be sold as salvage. *Id.* ¶ 12.

This was not the salvage of freight "in and of itself" however. When a carrier sells freight, knowing that the property belongs to another entity whom it does not notify prior to the sale it certainly is a morally turpitudinous, "devious and dishonest" act. Connizzo's deposition testimony, cited above, is sufficient to establish that Arrow knew that the camcorders belonged to Philips. Even if Connizzo was the only one who knew, this fact would establish employee dishonesty causing the loss. Though Connizzo may not have *ordered* the sale, neither was he a mere outside observer of the events in question. He was directly instructed by Matarazzo to arrange the sale of the freight, and he in fact did so. *Id.* at 21–22. Royal's motion for summary judgment declaring that the Policy does not cover this loss therefore is granted.

III. *Philips's Cross–Motion Against Royal*

Philips cross-moves for summary judgment against Royal claiming that because the Policy provides that it covers loss or damage to cargo "while in transit at your risk" and because no facts establish that there was any dishonest act while "in transit" the dishonesty exclusion does not apply. However, even assuming that the camcorders were not "in transit" when they were sold as salvage, the "in transit" language is contained only in the Shipper's Interest Form, which, as determined above, is inapplicable to losses while acting as a common carrier. The Cargo Form, on the other hand, provides coverage for "Property of others described in the Declarations *while in your care* as a carrier." Royal Ex. A. ¶ A.1. It is undisputed that the camcorders were in Arrow's "care" when the loss occurred.

The second component of Philips's cross-motion alleges that it must prevail as matter of law on the "Endorsement for Motor Common Carrier Policies of Insurance for Cargo Liability Under Section 21, Interstate Commerce Act," contained in the Policy ("Form BMC 32"). Because Arrow concedes its liability to Philips under Form BMC 32, *see* Royal Reply Memo. at 9 n. 6, summary judgment is granted as to this portion of the cross-motion in the amount of $5,000, Form BMC 32's provision for a single loss.

*Philips's Motion for an Order Permitting Amendment of the Complaint*

Philips's motion for an order allowing it to amend the Complaint to add a cause of action against Kemper Insurance Company ("Kemper") as Arrow's insurance company is granted. According to Philips, Kemper took over Royal's role as Arrow's insurance company as of September 1, 1989.

*Conclusion*

For the foregoing reasons, Philips's motion for summary judgment against Arrow is granted. Royal's motion for summary judgment against Philips is granted. Philips's cross-motion is granted in part and denied in part.

Submit orders on notice.

It is so ordered.