## MAGDEBURG GENERAL INS. CO. *v.* PAULSON.

*(District Court, S. D. Georgia, E. D.   November 30, 1886.)*

1. CARRIERS — OF GOODS — SHIP — EVIDENCE REVIEWED — VESSEL HELD UNSEA-
   WORTHY.
   On the evidence stated, the vessel is adjudged unseaworthy.

2. SAME — DAMAGE TO CARGO — PARTIAL INJURY — MEASURE OF DAMAGES.
   If the damage complained of is the partial injury or destruction of the property shipped, in the absence of proof of fault or fraud on the part of the carrier, the difference between the actual value of the goods at the point of destination at the time and in the condition in which they did arrive, and their actual value at the time and in the condition in which they ought to have arrived, is the proper amount of recovery.

3. SAME.
   In other words, when there is a breach of contract, the amount that would have been received had the contract been kept is the measure of damages, if the contract is broken.  POLLOCK, C. B., in *Alder* v. *Keighly*, 15 Mees. & W. 117.

4. SAME — MARKET VALUE — HOW ASCERTAINED.
   *Held*, under the facts of this case, that the market value of the damaged rice was to be determined by the price it actually brought after it was beaten and prepared for market, and not by the testimony of the experts.

*(Syllabus by the Court.)*

In Admiralty.   Libel *in personam.*
*Garrard & Meldrim*, for libelants.
*Lester & Ravenel*, for respondent.

SPEER, J.   The libel is sued out by the Magdeburg General Insurance Company, a corporation by the laws of the kingdom of Prussia, against Paulson, the owner of the schooner Pilot.   It alleges that on the tenth day of September, 1879, A. E. Moynello shipped on the Pilot a cargo of rough rice in bulk, from the Vallambrosa plantation, on the Ogeechee river, to Savannah, Georgia; that the rice was to be delivered in good order to Moynello, on the schooner, at the upper rice-mill, in Savannah; that it was delivered badly damaged by water; and that this damage was occasioned by the unseaworthiness of the schooner.   The cargo had been insured against marine losses with the libelants, and they paid all the damages to Moynello, and the costs of a board of survey; the amount being $563.   Moynello assigned, in consideration of this payment, all his claim for damages against the Pilot to the libelants.   They allege that they are subrogated to his rights for compensation from the owner

of the schooner, and that they made a demand upon Paulson for the amount paid to Moynello by them, and on his refusal, brought the action, civil and maritime. Respondent filed an answer, in which he denies that the Pilot was unseaworthy, and that the injury to the rice was caused by negligence; but alleges that it was caused by a boisterous sea, which strained the seams of the vessel during a strong east wind. He also denies that Moynello was damaged.

On the hearing, many witnesses were examined, but the evidence is quite clear that the Pilot was unseaworthy, and at the time of this shipment unfitted to safely convey a cargo, even on the quiet waters stretching from Vallambrosa to the harbor of Savannah. The port wardens A. M. Miller and Thomas H. Laird, together with H. F. Willink, a master ship-carpenter, surveyed the Pilot, and give their testimony as witnesses to the effect that they found her planking and frame defective, with a large leak on the stem under the bowsprit. The leak had recently been covered with canvass, but, in the opinion of the witnesses, the Pilot made a great deal of water at that point, and was not in a seaworthy condition to carry grain or any perishable cargo. The "protest" filed by the mariner who navigated the Pilot on this voyage, in its enumeration of the perils of the deep encountered, mentions nothing more severe than a strong breeze from the eastward, with a heavy sea, "which compelled him to put the Pilot in the marsh, and pump her out." On this evidence the Pilot is adjudged unseaworthy at the time the cargo was shipped.

The testimony of Mr. Moynello is that the cargo consisted of a fine lot of rice, in good order at the time of its shipment; that it was delivered at the rice-mill, and was wet and injured. Frank Buchanan, an expert with rice, testified that with Mr. McArthur he examined the rice on board the schooner, and found it wet. It was impossible to separate the wet from the dry; that nobody could tell exactly what the damage was, but they estimated it to be 34 per cent.; that the market value of rice in Savannah at that time was $1.60 to $1.65 per bushel; that he sold some of the rice of this shipment; that it brought $1.36 to $1.40 net, equivalent to $1.65 gross; that this was the full market price. W. T. Owen, clerk in the rice-mill, testified that the cargo of rice was handled with great care, and it turned out as well as if it had never been injured, and that Mr. Moynello got as much for it, less the expense of handling and milling, and less a loss of 26 bushels, which could not be used. He also testified that the extra expense consisted in the hire of two hands for nine days, at 75 cents per day. Major Tilton, superintendent of the rice-mill, testified that it took nine days to cure this rice in the mill, and that the moisture did not penetrate the grain; that all of it turned out in good condition, except 26 bushels; that he was surprised at the quality of the rice; that it was much superior to what he expected. The witness Freeman testified that the rice brought the best market price.

From this evidence, it is manifest that the rice was injured to some extent because of the unseaworthiness of the schooner in which it was

shipped. To the extent of that injury libelants, who were the insurers, were liable to Mr. Moynello; and the amount which they should properly have paid to him they are entitled to recover from the respondent. In order to ascertain what is that amount, it is necessary to determine what is the measure of damages in view of the facts in this case. It is insisted by the counsel for the libelants that the damage must be estimated in view of the condition of the rice at the time of its delivery by the carrier at the point of destination, and that the testimony of the experts who examined the rice at that time is conclusive, and shows that it was injured 34 per cent. of its value, which amount, with interest thereon, they insist the libelants should recover. The general rule that, in case of injury to the property by the carrier, the measure of damages is the difference between the value of the goods and what their value would have been if they had not been damaged in the course of transportation, may be considered as settled. 3 Suth. Dam. 237. The difficulty is in the ascertainment of what is such difference of value. This is a matter of evidence. The testimony of the gentlemen who inspected this rice would be satisfactory, if there was no other evidence before the court to show its actual condition, although the inspection of a cargo of grain in bulk, only partially exposed to view, is necessarily superficial. If it turns out that there was no loss, does it not follow that there was no damage? But, say the counsel for libelants: "Suppose the rice had turned out badly, could the defendant have been held liable for the loss of handling in the mill?" In that event there would likely have been no facts before the court to negative the testimony of the appraisers, and their testimony might have been controlling.

Nothing is better settled in estimating damages than the rule that every case is to be governed by its own facts. There was a duty on the shipper as well as on the carrier. It was the duty of Mr. Moynello to do the best he could with the wet rice, and to be diligent about its manipulation, and thus, if possible, to prevent loss. If he had intended to sell the cargo as rough rice,—if that had been the purpose for which the shipment was made,—the evidence of the appraisers might have been conclusive. But that was not his purpose. The rice had been consigned to the rice-mill, to be beaten and prepared for the market. This process developed the fact that the injury was apparent, and not real, and that, at a trifling expense, the rice was made marketable, and at the highest net price. It cannot, therefore, be justly insisted, because while in transmission, at one time, the cargo seemed damaged, that the court must settle damages on a partial view of the facts, and must not look further to ascertain whether the apparent damage was actual and injurious. The value upon which this is to be estimated is the net value, after deducting freight and expenses. Pars. Shipp. & Adm. 271; *Wallace* v. *Vigus*, 4 Blackf. 260; *McGregor* v. *Kilgore*, 6 Ohio, 358.

To illustrate: Suppose the carrier had delayed to deliver the goods beyond the day promised, and the shipper, for that reason, for one day, had failed of a market, and yet, on the day thereafter, sold for a price quite as good as that he could have had the day before, could anything

more than nominal damages be given for the delay? I think not. The true rule is this: that if the damage complained of is the partial injury or destruction of the property shipped, in the absence of proof of fraud or wrong on the part of the carrier, the difference between the actual value of the goods at the place of delivery, at the time and in the condition in which they did arrive, and their actual value at the time and in the condition in which they ought to have arrived, is the measure of damages. In other words, the amount which would have been received had the contract been kept is the measure of damages, if the contract is broken.

There has been some contrariety of opinion as to the manner in which this actual value should be ascertained. In *The Columbus*, 1 Abb. Adm. 97, it was held that where goods were damaged during transportation on board ship, and were received by consignees upon an understanding that the depreciation was to be made good to them, and they were sold at auction by the consignees, but with the assent of the master, for the purpose of making adjustment of the amount due from the vessel for the injury, the sum realized at the sale should be regarded as the value of the goods in their damaged state. Where the vessel proved unseaworthy, and put into port, the voyage broken up, and the plaintiff's cargo sold, held, that the loss on the goods, taking them at their "invoice price," resulting from the sale, was the true rule of damages, on the ground that there was no fault or fraud on the part of the defendant; the case showing only the breach of the implied warranty of seaworthiness. *Wheelwright* v. *Beers*, 2 Hall, 391. In the case of *Hamilton* v. *The Kate Irving*, 5 Fed. Rep. 631, where cotton ties were injured by being stowed with chemicals, it was held that the market value of the damaged cotton ties was to be determined by the price they actually produced when sold, and not by the testimony of experts. See, also, Barb. Ins. § 155 *et seq.;* Pars. Shipp. & Adm. 271–273; 2 Phil. Ins. 1460.

For these reasons it is clear that the libelants improvidently paid to Mr. Moynello the sum fixed by the appraisers for the apparent damage, without waiting to ascertain what was the real damage. To this appraisement, Paulson, the owner of the Pilot, was not a party, and did not consent. The libelants cannot, therefore, recover from Paulson the amount for which they sue. They are entitled to recover for the extra expense incurred in handling the wet rice, and also for the value of 26 bushels of rice so injured as to be worthless, and for the costs of the survey of the Pilot. It is true, as insisted by respondent, that the claim of libelants was largely in excess of their just demand; but it is also true that Paulson offered to pay nothing, when he was clearly liable for some amount, and he also greatly increased the expense of the trial by maintaining that his vessel was seaworthy, and he must have known that it was unseaworthy. For these reasons it is adjudged that each party pay half the costs. Let the decree be framed accordingly.