## CRAIL v. ILLINOIS CENT. R. CO.

District Court, D. Minnesota, Fourth Division. September 23, 1927.

**Carriers ⬅135—Amount recoverable by shipper for coal lost in transit is determined by market price in quantity such as that lost.**

A carload of coal, when delivered by the carrier, was 5,500 pounds short. To purchase that quantity and no more in the open market at the place and time of delivery, the shipper would have been required to pay $9.70 per ton. *Held,* that such price measured his loss, and not the wholesale price when bought in carload lots.

At Law. Action by G. I. Crail, doing business as the P. McCoy Fuel Company, against the Illinois Central Railroad Company. Judgment for plaintiff.

See, also, 2 F.(2d) 287 and 13 F.(2d) 459.

Stanley B. Houck, of Minneapolis, Minn., for plaintiff.

Edward C. Craig, of Chicago, Ill., and Guesmer, Carson, Brown & Loughin and Edwin C. Brown, all of Minneapolis, Minn., for defendant.

George A. Kingsley, of Minneapolis, Minn., amicus curiæ.

CANT, District Judge. This is an action brought by the consignee of a carload of coal against the railroad company which had undertaken to transport the coal. The amount of the shipment was 88,700 pounds. Of this amount 5,500 pounds were lost in transit. The destination was Minneapolis, Minn., and the delivery was on an industry railway track running alongside of or into plaintiff's coal yard at that place. It is agreed that, at the time and place of delivery, coal of the kind here in question was worth $5.75 per ton, plus freight, in carload lots of from 60,000 to 120,000 pounds. It is also agreed that the same kind of coal at retail in the Minneapolis market, at the time in question, delivered at the place of business or home of the consumer, was worth $9.70 per ton, plus freight. Plaintiff claims that he is entitled to recover at the rate of $9.70 per ton for the coal which was lost. Defendant admits liability, but claims that the amount of recovery should be limited to $5.75 per ton. No freight was paid on the coal which was lost, and that item may be eliminated from the discussion. The facts were presented to the court originally by stipulation, and the opinion of this court thereon is found at 2 F.(2d) 287. That case was reversed by the Circuit Court of Appeals, and the opinion thereon is found at 13 F.(2d) 459. The appellate court there held that a recovery should be had on the basis of $9.70 per ton. Thereafter the stipulation of facts was amended and amplified, and with the stipulation so changed the case was again presented to the court on a second trial. This court is not satisfied that the amended stipulation of facts justifies the conclusion that the case has been substantially changed. Following the decision of the Court of Appeals, therefore, it is the duty of this court to allow a recovery at the rate of $9.70 per ton for the coal which was lost, and this will be done.

The case, however, is of rather unusual interest and importance. It is assumed that it is not inconsistent with the fullest measure of respect for the appellate court, to offer further suggestions in the interest of justice upon the questions involved. It is for this court to follow the decision of the appellate tribunal, but that tribunal itself may at some time wish to re-examine the matters which are here in controversy. It is in that light and for that purpose only that the suggestions which follow are made.

The case at bar is the ordinary case of a commodity purchased in bulk for the purpose of selling the same again at an advance, if possible, but without any necessity or occasion for going into the local market to replace any portion of the commodity which might be lost in transit. Under the circumstances hereinbefore set forth, as amplified by the stipulation of facts, what is the measure of damages in this case? Is plaintiff entitled to recover at the rate of $5.75 per ton, or at the rate of $9.70 per ton for the coal which has been lost?

Basically, the case is one for the recovery of damages for breach of contract. This particular controversy belongs to a subclass of breach of contract cases. It involves a breach by a common carrier of its agreement to transport and deliver freight. The same general rules apply here as in all other cases of breach of contract. It will be seen that certain subsidiary rules are specially applicable. The difficulty in such cases arises in estimating the amount of the loss which the plaintiff has sustained. The courts have said that in this connection each case must be governed by its own facts. Magnin v. Dinsmore, 62 N. Y. 35, 20 Am. Rep. 442; Magdeburg General Ins. Co. v. Paulson (D. C.) 29 F. 530, 532. This does not mean that the cases are beyond the rules. They are not; it is at this point that the subsidiary rules intervene.

In the former opinion of this court certain outstanding features of the case were not made sufficiently clear.

1. Cases of the character here in question fall into certain groups or classes, and rules which apply to one class quite often do not apply to another. A classification upon one basis is as follows:

(a) Cases where general damages only are involved.

(b) Cases where special damages are claimed.

Upon another basis, the classification may be as follows:

(a) Cases where the consignee is under no necessity or compulsion to go into the local market and purchase commodities with which to replace those which have been lost.

(b) Cases where by reason of special circumstances the consignee is under some reasonable compulsion to replace the lost commodity by purchasing in the local market.

There are doubtless other classifications of less importance. The classifications above specified may very nearly duplicate each other. That is, all cases where there is no necessity of replacing the lost commodity would generally fall under the head of general damage cases; and very generally cases where the lost commodity must be replaced would fall under the head of special damage cases, but the distinguishing features of both classifications are important, because sometimes one basis of classification is emphasized by the courts and sometimes another, and because collectively they furnish the bases for the various rules which are announced; which rules, as applied to a particular situation, may be quite correct, but which, if applied to a different set of facts, may work an injustice.

2. The fundamental rule in all cases involving damages for breach of contract is that the damages recoverable are such only as, in theory of law, may fairly be said to have been within the contemplation of the parties when the contract was made. 17 C. J. 742–746, § 76; Harvey v. Connecticut & Passumpsic R. R., 124 Mass. 421, 423, 424, 26 Am. Rep. 673.

By the expression "general damages" is meant such damages as follow naturally and in the usual course of things from a breach of contract. In all ordinary cases it is general damages only which are held to have been within the contemplation of the parties. In such cases the question is, What is the immediate loss? without going beyond the first step. 17 C. J. 712, § 20; 17 C. J. 742, § 76.

"Special damages" are such as do not follow naturally or in the usual course of things from such a breach, but are such as arise out of unusual or special circumstances. Such circumstances, however, give rise to no claim for additional or special damages on account thereof, unless the circumstances were known in advance by the respective parties, and unless the consequences of the breach and loss under such circumstances were known to and in contemplation of the parties when the contract was made. 17 C. J. 712, § 76; 17 C. J. 746, § 77.

3. In this case plaintiff sues for general damages only. There is no allegation of special damages in the complaint and no proof thereof in the stipulation of facts. Here, if the fact is at all important, there is no claim or proof that, prior to the loss in question, defendant had any knowledge that the coal was being purchased for the retail trade; and the circumstance of such intended use appears, if at all, only as a matter of inference from the stipulated facts.

4. In cases such as the one at bar, therefore, where general damages only are claimed, a recovery for proximate loss only can be had—a loss which follows naturally and in the usual course of things from the breach of contract. This is an unvarying rule to which there are no exceptions. With subsidiary rules there may be variations or exceptions. In such cases as this the court does not go beyond the first step, nor concern itself with consequences which are remote. Southern Pacific Co. v. Darnell-Taenzer Co., 245 U. S. 531, 533, 38 S. Ct. 186, 62 L. Ed. 451. The question is, what loss plaintiff had sustained at the moment the car of coal was switched into his yard, with the 5,500 pounds missing therefrom? It is not what loss might be figured out at a later time under entirely new and different conditions. Plaintiff's cause of action accrued at once upon failure to deliver, and without waiting for later events. Southern Pacific Co. v. Darnell-Taenzer Lumber Co., supra, page 534 (38 S. Ct. 186). It made no difference whether the coal was to be sold at wholesale or at retail, or was to be consumed by plaintiff himself. The proximate loss "is the loss of what the contractee would have had if the contract had been performed." Chicago, M. & St. P. Ry. Co. v. McCaull-Dinsmore Co., 253 U. S. 97, 40 S. Ct. 504, 64 L. Ed. 801. In this case that would have been the 5,500 pounds of coal in the car, which amount of coal at the time of delivery, was missing therefrom.

5. A subsidiary rule, applicable in cases of this character, is that plaintiff is entitled to recover the value of the commodity which has been lost, as that value would have been

at the time and place of delivery if delivery had been made as agreed.

This rule is more elastic. In its application it does not always mean the same thing. Courts are often content with announcing the general rule without discussion as to its application. In various cases there is no difficulty about such application. In other cases the difficulty is very real. In various cases, as will be seen, this rule does not apply at all in any literal sense, and would provide no adequate relief.

In the case at bar, the broader, general and controlling rules must constantly be kept in mind; the plaintiff is entitled to be made whole. He is not suing for coal, but for money. He is entitled to the money equivalent of that which has been lost. There is no occasion for punishing the defendant by allowing excessive damages. There is no occasion for allowing plaintiff to realize a gain out of the transaction. He is not to receive a reward. He is to receive fair and reasonable compensation for his loss.

6. An unusual and outstanding feature of this case is the fact agreed upon, as to the value which the missing coal would have had at the time and place of delivery, if it had been delivered as agreed. There is no such element in the cases relied upon by plaintiff. Here it is agreed to, and is one of the settled facts in the case, and is beyond controversy, that, if the coal which was lost had not been lost, but had been delivered to plaintiff with the other coal in the car, its value in such car at destination in plaintiff's yard would have been $5.75 per ton. This value so agreed upon must be understood to be the true value in the car at the time and place in question for any and all uses to which the coal might be put. If plaintiff had received the coal in question, he would have had in his possession a commodity which all agree was of the value of $5.75 per ton. If he had it not, he obviously, so it may be urged, sustained a loss in that amount per ton on account of that which had been lost. The carload of coal, when it reached plaintiff's yard, was worth that much less than it would have been if none had been lost. We are enabled to determine the amount in this particular case, because here we have the unusual experience of being provided with data showing value at the immediate time and place of delivery. If the car had been delivered intact, the coal therein would have been worth $255.0125. As actually delivered, with the lost coal cut, it was worth $239.20. This is all agreed to. There is no cavil about it. The difference of $15.8125 would ordinarily be regarded as the loss which plaintiff must have sustained. This would be stopping at the first step, without inquiry into later conditions which might arise or develop, and without considering whether the coal was to be sold at wholesale, or at retail, or was to be consumed by the consignee.

7. Notwithstanding the foregoing considerations, it is urged by plaintiff that even in such a case as this, where we know the value of the coal at destination, the plaintiff is entitled to recover, not that value, but a considerably greater amount, represented by the retail selling price of such coal at such place. The reasons assigned are (a) that, if plaintiff had received the coal according to agreement, he could have sold it at the retail price; and (b) that, if plaintiff had wished to replace the missing commodity, he would have been obliged to pay the retail price at destination for the coal which he would purchase.

These reasons may be considered in their order.

(a) The value per ton in the car, $5.75, allows plaintiff an advance of $.25 per ton over the mine price. Some or all of this is profit. That is included in the proximate loss which the plaintiff sustained through nondelivery. In this respect the case is similar to Chicago, M. & St. P. Ry. Co. v. McCaull-Dinsmore Co., 253 U. S. 97, 40 S. Ct. 504, 64 L. Ed. 801, where the advance was somewhat over $200 on an entire carload of wheat which was lost. No retail prices were involved in the McCaull-Dinsmore Case. The spread between this value of the coal in the car, and the retail price thereof, all at destination, is $3.95 per ton. But a large part of this is absorbed in the operation of retailing. The coal must first be unloaded from the car. It must then be sold to some customer. It must next be reloaded into trucks or wagons, and then transported perhaps several miles to the place of business or home of the consumer and there delivered to him. The stipulation of facts is to the effect that it is only after all this has been done that the $9.70 per ton can be realized. Along therewith there has been the overhead expense, the insurance, the making of collections, the risk of and allowance for bad debts, and the directing services of the plaintiff himself. We know that the aggregate of these items amounts to a considerable sum per ton. The plaintiff has not advised us thereof in detail. To get this $3.95 per ton, he is obliged to pay out a good part thereof in the course of the retailing operation, and besides must render or provide proper supervision as well. We

do not know the amount of the net profit. It must be a rather modest sum. In any event, such profit, no doubt, bears some proper relation to the original cost of the coal and to the risks which are assumed and the expenses which are incurred and the considerable service which is rendered in connection with the retail trade. The $3.95 per ton is the sum of legitimate and necessary additions to the carload price, which must be made in connection with the retail operations in order that those operations may be successfully carried on. All this, however, is remote from the time, place, and circumstances which should determine the amount of plaintiff's proximate loss. By the decision in this case we are awarding plaintiff $3.95 net per ton over the carload price. This is much better for him than to have received the coal. He gets the full retail price without any risk or expense and without the work of any retail operations whatever. Had he received the coal, it is hardly possible that he could have realized net thereon, above cost and above the necessary expense of the retail operations, more than from $1.00 to $1.25 per ton. As to the figures, this is in part speculation, but necessary speculation, inasmuch as accurate information has not been adduced by the contending parties; but, no matter what the precise figures may be, the conclusion must be the same—that, looked at from the standpoint now under consideration, the award is substantially in excess of any legitimate loss which the plaintiff has sustained. In the face of many authorities against the allowance of profits in such cases, it is barely possible that net profits at retail might be allowed here, but that would be in violation of the rule limiting the recovery in such cases to damages for the proximate loss, and, in any event, we have no definite information as to what the profits would have been. It is quite clear that the considerable amounts per ton necessarily expended in carrying on the retail operations could not, upon any legitimate theory, be included in the recovery here.

In 4 Sutherland on Damages (4th Ed.) § 1098, p. 4178, the rule said to be applicable in such cases, and which is frequently quoted by the authorities, is stated as follows:

"The retail price of property held for sale is not the standard by which its value is to be determined. Where a quantity of merchandise is sued for, the retail price would be unjust, for the merchant in fixing that price takes into consideration, not only the first cost of the goods, but store rent, clerk hire, insurance, and probable amount of bad debts, and adds to all these a percentage of profit. This must be understood of a considerable quantity, not of a single article."

In theory of law, and presumably as a matter of fact, it was as advantageous to plaintiff to sell this coal at $5.75 per ton in the car, as it would have been to sell the same coal at $9.70 per ton at retail. The former price allowed a reasonable advance over the mine price, considering the risks assumed and the service required in connection therewith; the latter allowed a reasonable advance, we may assume, over the cost of the coal and the necessary risks, expense, and service in connection with the retail operations. Looking forward to selling the coal at retail, or to making any other use thereof, it was worth in the car the sum of $5.75 per ton and no more. After the lapse of some period of time and under changed conditions, and after the expenditure of considerable effort and the incurring of considerable expense, plaintiff might have sold the coal for the gross sum of $9.70 per ton. Does that fairly measure his proximate loss on account of the non-delivery thereof?

(b) Another reason assigned for recovery here on the basis of the retail price per ton, is that, if plaintiff had wished to replace the coal which had been lost, he would have been obliged to pay the retail price therefor. Inferentially it is assumed in such claim that plaintiffs have the right in all such cases to go into the market and buy at retail for the purpose indicated. Such statement of the rule has crept into the law and has been given a somewhat general application, because in some of the earlier cases and in various other cases since, the circumstances have been such that the claimant had the right to go into the market and replace the commodity which had been lost. This was sometimes in the wholesale market, and sometimes in the retail market, depending upon the character and amount of the goods which had been lost.

In determining the amount of damages in any case where general damages only are claimed, it is the proximate loss with which we are concerned. In all such cases the carrier is bound to pay the value of the goods as such value would have been at the precise time and place of delivery, under conditions there contemplated, if the delivery had been made as agreed. If we have means agreed upon for the ascertainment of that value, as we have here, without resorting to retail prices, then we are not specially concerned with the latter. The value in the car and the cost of replacement might be two very different things. If we are dealing with carloads of wheat, or cotton, or flour, or lumber,

or coal, such value and the cost of replacement would be the same. In such cases courts have sometimes said that the consignee is entitled to recover such sum as would enable him to go into the market and replace that which had been lost. That happened to be true with respect to carload lots only as the result of a coincidence. Such are ordinarily cases without special damages, and the ordinary rules apply. The consignee in such cases is entitled to recover the amount of his proximate loss. But in such cases the value per unit of the carload which has been lost is the same as the value per unit of another carload of the same commodity at the same place; the proximate loss and the cost of replacement are the same, and so the statements of the courts above referred to, though literally correct, are misleading if given a more extended application. The statements are true as to that particular class of cases.

There are other classes of cases where such general statements are made by the courts and are then lifted bodily, as it were, and given a broader and inaccurate application elsewhere. We are here concerned with and are speaking of the typical case of general damages, such as follow naturally and in the usual course of things from the breach, and with values at the precise time and place when and where delivery should have been made, not at some other time or place. By way of contrast and illustration, it is not wholly improper to refer to some of these other classes and to the statements of the courts made in reference thereto. In this connection there are the unusual cases of various kinds where under special circumstances, on failure to deliver, the consignee is under some reasonable compulsion to go into the market and purchase at retail. In all such cases his actual loss is measured by the amount he is required to pay. This may occur with reference to many articles or commodities which may be necessary for the daily requirements of the consignee in his private life, or in his occupation or business, and where, if goods purchased do not arrive, he must go into the market and supply them otherwise; or it may be a case where he has already sold the commodity in advance and where he must go into the market to purchase that with which to make up the exact amount which he has lost. All these, however, are usually cases of special damages, which require special pleading, and, properly, should be dealt with along those lines, although this point is not always made. Vanderbilt v. Ocean S. S. Co. (C. C. A.) 215 F. 886, 890. Here again courts may make the general statement that in case of loss in transit the consignee is entitled to recover such sum as will enable him to go into the local market and replace the commodity by a purchase at retail. Such statement, made in general terms, may be correct as applied to the particular case there in hand, but, it may be urged, is incorrect when extended to a case where general damages only are involved. It will be observed, however, that in all these cases of special damages the consignee obtains no advantage and realizes no profits on the transaction; and the defendant is not mulcted in damages, arbitrarily or unnecessarily, but is required to pay such an amount only as will make the plaintiff whole.

Again, there are the cases where general damages only have been sustained, but where there is difficulty in fixing values as of the time and place of delivery. In such cases it is sometimes necessary to resort to values at the time and place of shipment, and therefrom, as nearly as may be, to estimate the value at destination. Northern Commercial Co. v. Lindblom (C. C. A.) 162 F. 250, 255; The Arctic Bird (D. C.) 109 F. 167, 175. Sometimes it is necessary to resort to retail prices at destination, and therefrom, as nearly as may be, to estimate values in bulk or otherwise at that place. And sometimes, in cases involving single articles, or under unusual circumstances, the retail price at destination is the substantially correct measure of value of the lost article or articles at that place. The question of value at destination is always a question of fact, and it must be determined as other questions of fact are determined, upon the best evidence available for that purpose. In such cases again courts sometimes make general statements which give trouble when applied in other cases. It is clear, however, that, in cases where the value at destination is agreed upon and is a settled fact, the troubles respecting these matters of evidence do not obtrude.

There was no necessity, occasion, or advantage here for the plaintiff to go into the local market for the purpose of purchasing coal with which to replace that which had been lost. There is strong ground for urging that a consignee of commodities, in case of their loss in transit, has no absolute or universal right to go into the local market at the point of destination and purchase goods at retail, with which to replace that which has been lost. He may do this only to the extent which may be reasonably necessary to protect his rights, not the sentimental right of having a thing at all hazards, because he has bargained for it, and this without regard

to the rights of others, but his substantial rights and interests. He should not be permitted to purchase at retail when this places an excessive burden on others and does himself no good. He may not insist on this one burdensome method of adjustment, when other methods, quite as favorable to himself, and less harsh to others, are equally available. He should not be permitted to mulct the carrier in an amount in excess of what he has actually suffered. To do so would work an evident injustice. The carrier has some rights, as well as the consignee.

In cases such as this, involving the loss of part of a shipment of a considerable quantity, all to be resold (and these features are mentioned, not to create a separate class, but because a case of this character serves well as an illustration and covers the case at bar), and where general damages only are involved, it may fairly be said, from what we know of human conduct, not only that the consignee is not obliged to go into the local market and buy, but, more than this, that he never does such a thing, does not wish to make any such purchase, and will not do so unless under some form of compulsion. Moreover, if in this case plaintiff had purchased at retail and had paid $9.70 per ton and had placed his coal in the car to take the place of that which had been lost, the coal so purchased at retail would have been worth $5.75 per ton in the car, and no more. If we compel defendant to reimburse plaintiff on account of the supposed new purchase, we require it to pay $9.70, so that plaintiff may have $5.75. Again, by establishing the rule prayed for by plaintiff, we make assurance doubly sure that under the circumstances here involved no consignee will ever make a purchase at retail. Such an award as he asks places him at a substantial advantage over the position in which he would be if he should go into the market and buy. If he should actually buy, he would then have the coal on his hands and would be obliged to sell the same again, either at wholesale, or at retail. If he should sell at wholesale, he would receive $5.75 per ton for the coal. If he should sell at retail, and should succeed in making collections, he would finally realize the comparatively small amount of profit which the retail business affords; but we are giving him a sure net profit of $3.95 at the outset above the value of the coal in the car, and are relieving him of all care, annoyance, expense and risk of the retail trade in connection therewith. No one would be so stupid as to buy and handle the coal under such circumstances. We have a sure guaranty that he would not. He would keep the money.

8. The stipulation of facts states that all sales of coal of the character here in question, of less than 60,000 pounds, in the local market at the time and place in question, were considered sales at retail. It is further stipulated that the retail market price of 5,500 pounds of such coal at such time and place was $9.70 per ton. The stipulation does not specify the retail price of quantities of such coal weighing more than 5,500 pounds and less than 60,000 pounds. Drawing upon the current fund of general information for purposes of illustration, we may readily conclude that the retail price holds good for all quantities sold at retail. It is common knowledge that this is so, or that the variation is very slight. A man who buys 5,500 pounds or 2¾ tons of coal, at retail, pays the same price per ton as the man who buys 55,000 pounds, or 27½ tons. As already indicated, the value of the entire carload of coal delivered in plaintiff's yard in Minneapolis, if none had been lost, would have been $255.-0125. If all had been lost, the recovery would have been limited to that sum. Under the rule which is being applied in this case, if the weight of the coal which was lost had amounted to 55,000 pounds, plaintiff would be entitled to recover the sum of $266.75, on account of such loss, an amount substantially greater than he could have recovered if the entire carload had been lost; and, in addition thereto, he would have on hand that part of the coal which was not lost, amounting to 33,700 pounds. Can this be a correct application of a correct rule?

9. Again, if we assume that the carload of coal in question had been purchased by a wholesale dealer, where does the rule contended for by plaintiff lead us? Confessedly, such wholesaler purchased the entire lot for the purpose of selling again at wholesale. Confessedly, the coal and each ton thereof, in the car would have been worth $5.75. It would sell for that and no more. That is the price which the wholesaler would ask for it and which he would expect to obtain for it, and the price which afterward he would realize therefor, when a sale should be made. The 5,500 pounds of coal is missing. If it had been in the car it would have been worth the same amount per ton as the other coal there, and would have sold for the same price. Under such circumstances is it possible that the wholesaler would have a right arbitrarily to say to the carrier: "I want that coal. It is worth only $5.75 per ton to me. I do not need the coal itself for any purpose. If I receive $5.75 in money for each ton thereof, I would be as well off as if I had the coal; but I want the coal,

and you must pay me $9.70 per ton for it, because that is the amount I must pay in the local market for other coal to replace that which has been lost." Or might the wholesale dealer in such case go a great deal further, as the plaintiff does in the case at bar, and say: "You have lost my 5,500 pounds of coal. I do not want it, or need it. I am not going to try to replace it. If I had it here in the car it would be worth only $5.75 per ton. That is my proximate loss. I could not sell it there for more than that amount. I am selling the remainder of the carload at that price. My only loss measured in money is the loss of the value of that coal in the car. But I demand that you pay me for the missing coal the price which I would have to pay for it at retail, if I desired or was obliged to replace it. That is $9.70 per ton." If such a claim should be allowed, the wholesaler would be making money fast on lost coal. He would always wish for generous losses on all shipments to him. Admitting that the coal was worth only $5.75 per ton in the car and that if the missing coal had been there, he would have sold it at that price, he is nevertheless demanding $9.70 per ton therefor. It would seem quite improbable that the wholesale dealer would be allowed to successfully make such a claim. Quite clearly he would have to be content with $5.75 per ton. The coal of a retailer in a car, however, is worth no more than the same coal would be worth if owned by a wholesale dealer, and in case of the nondelivery of any part thereof, the loss would be precisely the same. There cannot be one measure of damages for the one dealer and another measure for the other.

Again, in testing the general accuracy of the decision here, the following considerations are not without some bearing: The carload of coal as delivered, with the missing coal out, was worth $239.20. If the carload had been intact, it would have been worth $255.0125. If, instead of any coal having been lost, the carload of coal had been damaged so that when delivered it was worth only $239.20, then, under all the authorities, the amount of recovery would be the difference between the value as actually delivered, and its value as it should have been if delivery had been as agreed. United S. S. Co. v. Haskins (C. C. A.) 181 F. 962, 965; Magdeburg, etc., v. Paulson (D. C.) 29 F. 530, 532, 533. Such difference and the amount of such recovery would be $15.8125. But here, where the real loss is confessedly the same, we allow a recovery of $26.675. Or, stated otherwise, if two cars had been shipped, one to each of two separate dealers at the same destination, and if the coal in one car had been damaged in transit, so that on delivery the carload was worth only $239.20, where it should have been worth $255.0125, and if from the other car certain coal had been lost in transit, so that such carload when delivered was worth also $239.20, when it should have been worth $255.0125, we would be allowing a recovery of $15.8125 in one case, and of $26.675 in the other.

10. From the foregoing it is reasonably clear that there is much confusion in the cases, and in the statement of the rules, and in their application to situations which are widely different. It is apparent that distinctions which go well nigh to the root of the matter are sometimes overlooked. These distinctions seem to be vaguely in mind in some instances, where right conclusions are reached, without stating correctly the underlying reasons therefor. We speak of pleading special damages, and of values at the time and place of delivery, and of retail prices, and of profits, and of the right to go into the market and buy, and of the risk, cost, and service in connection with retail operations, and of the price at which the commodity in question will sell in the local market. These matters are discussed indiscriminately in all kinds of cases where commodities have been lost in transit.

A distinction between the rule applicable to the loss of a separate article and that applicable to the loss of a larger quantity of merchandise, and especially when the latter is held for resale, is suggested in the quotation from Sutherland on Damages, supra. There is grave doubt whether there is any satisfactory reason, operating uniformly and in all cases, which will support such distinction. Whether the commodity lost was large in quantity, or was a single article; whether the consignee intended to effect a sale at wholesale, or at retail, or intended not to sell at all; whether the commodity was new or secondhand—are all questions of a strictly subordinate character. The one question which is the same in all cases where general damages only are involved is the value of the lost commodity as that value would have been at the time and place of delivery under the conditions there contemplated, if delivery had been made as agreed. The apparent difficulty with different cases, and in the application of the rules thereto, is often in the evidence necessary and in the application thereof. It often occurs that the value of a large quantity of any commodity is not the same as the retail price at which such com-

modity is being sold in the local market. It is not always so easy to prove the value of a single article at a given point without inquiring into the prices there prevailing at retail; but, if the value of a separate article at a given point is shown to be different from the retail price of such article in the local market, such article then takes the same course as the commodity in large quantity, and is dealt with the same; and it should be clearly understood that the only legitimate purpose of consulting local retail prices in any such case is for the light, if any, direct or indirect, which a knowledge of such prices may shed upon the ultimate question of value above referred to. It is a course of procedure, not at all controlling, but advisory, which is employed in determining that value. No recognition is involved of any arbitrary right on the part of the claimant in such cases to go into the local retail market, under any and all circumstances, and there make an actual purchase.

11. If the foregoing observations be deemed mainly or largely incorrect, or inconclusive, they will be disregarded. If, in the main, they shall be found to be correct, it may perhaps be considered, with reference to the first two classes hereinbefore referred to, in the first of which falls the case at bar, that the rules applicable thereto should be as next hereinafter set forth, with such variations therein as may seem proper.

(a) In the usual or ordinary case involving general damages only, where the commodities have been lost in transit and where the loss thereby sustained is such only as follows naturally or in the usual course from such loss:

Under such circumstances, the single question is the amount of the proximate loss which has been sustained, and this in turn means what would the lost commodity have been worth in money at the precise time and place and under the conditions of the contemplated delivery, if delivery had been made as agreed.

If, by admission, or otherwise, on all the evidence, it is established that at such time and place the true value of the lost commodity was other than, and different from, the price at which such commodity was being bought and sold at retail in the local market, then such established value will be the measure of recovery; and the retail price will not prevail as a measure of recovery merely because that is the amount for which the plaintiff might have been able to sell the missing commodity at retail, or because, if he wished to replace the same, he would have been obliged to pay such retail price for the commodity with which to make such replacement.

If on the other hand, in such a case, either from absence or insufficiency of evidence, it is not satisfactorily established that the true value of the missing commodity, at the time and place of delivery, would have been an amount other than and different from the retail price thereof in the local market, then evidence of such retail price may be of greater weight and importance, and, where it is sufficiently persuasive of the true value, it may be accepted as indicating the proper measure of recovery. It is the value on the spot as that value would have been if the commodity had been delivered as agreed, with which we are concerned. That measures the proximate loss sustained by the consignee. It may, in certain cases, be the same as the retail price.

(b) In the unusual case involving special damages, where the commodities have been lost in transit, and where by reason of special circumstances the consignee has been under some reasonable compulsion to go into the local market and supply himself with the commodities which have been lost:

In cases under this head the consignee must pay the going price. If the goods which were lost consisted of carload lots, he then pays the price at which such quantities may be obtained. If the amount which he must have is obtainable at retail only, he must pay the retail price. Under such circumstances he must pay a certain amount to cover the cost of selling goods at retail, and he must pay the retailer's profit. In justice to the carrier he should purchase at the lowest price at which the commodity is reasonably available. There is no question about the rule under such conditions. If the consignee pleads and proves the special circumstances, and that he was under reasonable compulsion to go into the local market and purchase either at wholesale or retail, and that such consequences were in the contemplation of the carrier and himself when the shipment was made, he may recover the amount which he was compelled to pay.

There are other cases involving the loss of commodities in transit which fall outside any of the foregoing classes. Such cases are comparatively few in number and usually are of minor importance, although this may be otherwise. There is the case of the loss of goods purchased for a seasonal market, by a retailer, under circumstances such that they cannot be replaced in time to meet the trade. Examples of this are certain classes of women's wear which are sold at a particu-

lar time of the year, and toys purchased for the Christmas trade. In such cases the merchant loses the season's sale of such goods and the profits which would have accrued thereon. Under such circumstances the questions of what the goods could be bought for at destination, or what they would have been worth on the spot where they should have been delivered, are not important. The only questions are what they would have sold for at retail, and what the net profits would have been thereon. In such special cases the merchant is usually allowed such net profits on the anticipated sales. That would be his actual loss.

Again, there is the loss of machinery, or parts thereof necessary in carrying on industrial or mechanical operations, where the effect of such loss is to suspend such operations and causes inconvenience and loss. If such consequences were in contemplation of the parties, a recovery may be had on account thereof.

There are also cases where a single article of value is lost in transit, or where partially used household goods, or wearing apparel, or mechanical equipment are lost, and where there is no standard of value applicable thereto, except the current prices at retail. In such cases those prices are sometimes allowed to control as being the best evidence obtainable or they are used as a standard from which deductions may be made. Such cases, however, often fall within the class where the consignee is under the reasonable compulsion of going into the market and replacing the lost commodity by purchase at retail. The real reason for allowing a recovery on the basis of the retail price, therefore, is sometimes not clear.

These latter classes are all special in their nature, and special rules for estimating the amount of the damages are applied.

12. Aside from the few citations hereinbefore made, the authorities generally applicable in this case are referred to in the two aforementioned opinions therein. There is no difference of opinion between the parties as to the rule for determining the amount of plaintiff's damage—the value at the time and place delivery should have been made. The sole dispute arises over our resort to retail prices in determining that value when the value already has been agreed on before and without such reference.

Various cases are cited where, in a general way, and for one reason or another, the courts say that, in the particular case there in hand, the plaintiff should recover such amount as would enable him to enter the local market and replace that which had been lost. Generally there is no quarrel with such cases. More common still is the general statement that plaintiff is entitled to recover the value or market value of the commodity lost at the place of destination.

13. At the time this case was first decided, the one case which, arguendo, most strongly and directly supported plaintiff's claims was Heidritter Lbr. Co. v. Central R. Co., 100 N. J. Law, 402, 122 A. 691, 692. Since then, to the same effect, has been decided the case of Leominster Fuel Co. v. New York, N. H. & H. R. R. Co. (Mass.) 154 N. E. 831. The latter case rests on the authority of the Heidritter Case, and the decision by the Court of Appeals in the case at bar. In both the Heidritter Case and the Leominster Case, the most distinguishing and controlling feature of the case at bar was entirely absent. Reference is now made to the value, established by agreement of the parties, which the coal in question would have had in car at destination if delivery had been made as agreed. This feature was not sufficiently stressed by this court in its earlier opinion.

In the Heidritter Case it was said that "the real question at issue is whether the plaintiff was entitled to recover the retail value at destination, rather than the wholesale value at the point of shipment." 100 N. J. Law, 403, 122 A. 691. In the Leominster Case the alternative allowed by the evidence was the cost of the coal at the mine, plus freight, which defendant claimed was the true basis of recovery, and the retail price of such coal at the yards of dealers, or such price delivered in plaintiff's yard. Plaintiff claimed a recovery on the latter basis, and such claim was allowed. In both cases it was held, in effect, that the plaintiff should recover on the theory that he had a right to go into the local market and replace the lost commodity by purchase at retail, which theory, for the reasons hereinbefore set forth, should not be conceded. It will be observed that each of these two cases are within a much narrower compass than the case at bar.

We are dealing here with a commodity which has two well-recognized values or prices in the same market: One is the value or price at wholesale, when we are dealing with lots of 60,000 pounds or over; the other, the value at the end of and after a considerable amount of service and expense and risk, which we call the value or price at retail. The loss here is part of a wholesale shipment. Shall we apply the retail price in determining the loss or damage sustained? It is believed that, aside from the decision by

the Court of Appeals, the two cases above cited are the authorities which tend most directly to support plaintiff's views. Aside from the Heidritter Case, the authorities cited in the decision of the Court of Appeals in support thereof, in the main, are content with announcing the general rule. The Yazoo Case therein cited will be later referred to. The case of Cutting et al. v. Grand Trunk Ry. Co., 13 Allen (Mass.) 381, also cited, was a case of replevin for a quantity of flour which the defendant had refused to deliver until certain charges thereon claimed by defendant should be paid. The court states the rule for the measure of damages in cases such as this (pages 384, 385), and, in connection with a discussion as to the measure of damages where there has been a delay in the delivery of goods, and a fall in the market value meantime, makes the statement quoted in the decision of the Court of Appeals herein. That excerpt and the decision throughout rests on the general statement of the value, or the market value of the goods at destination. The discussion goes no further. Profits are disallowed (page 386), and at page 387 it is said: "Profits include the increased value arising from the purpose to which the plaintiff intended to apply the goods." The general effect of this would be to hold plaintiff here to the value in the car. We, however, are asked to go much further than the allowance of profits. We are asked to allow and pay plaintiff for expenditures which he does not make, and for services which he does not render, and for risks which he does not take.

14. In opposition to the claims of plaintiff are a considerable number of cases which decline to adopt the retail market value as the measure of damages in cases such as this. They do not all employ the same reasoning, nor reach precisely the same results, but are all agreed in rejecting the retail price standard.

Brown Coal Co. v. Illinois Cent. R. Co., 196 Iowa, 562, 192 N. W. 920, is a carefully considered case. If the foregoing views are correct, the court there should have allowed a recovery based on the value of the coal in the car at destination. There is some ground for urging, however, that there is no clear evidence of such value.

Yazoo & M. V. R. Co. v. Delta Grocery & Cotton Co., 134 Miss. 846, 98 So. 777, was an action to recover the value of certain flour lost or damaged in transit. It is there stated that "the exact point in controversy is whether the appellee, a wholesale grocer, is entitled to recover * * * the invoice or cost price, plus the freight," of the damaged flour, "or the resale value (that is, the price at which the flour could have been sold, or, we will say, the reasonable cash market value), at the point of destination." 134 Miss. 847, 98 So. 777. " * * * The damaged flour cost plaintiff $10.44 per barrel delivered at Clarksdale. Plaintiff recovered $11.30 per barrel for the damaged flour, which represents what plaintiff could have sold the flour for, or its reasonable wholesale cash market value at the point of destination." This wholesale cash market value is what defendant contends for here as the proper measure of recovery.

H. T. Cottam & Co., Inc., v. Illinois Central R. Co., 3 La. App. 240, was decided in October, 1925. The case was presented in such a way that contemplated profits occupied an important place in the case. These were disallowed, and plaintiff held to the original cost of the merchandise, plus freight.

In Central Georgia R. Co. v. American Coal Co., 28 Ga. App. 95, 110 S. E. 320, certain coal was lost in transit from a carload shipment. Plaintiff was limited in its recovery to the wholesale price at point of destination.

For further cases which decline to adopt the local retail price as the measure of damages in such cases, see the following authorities: Chicago, R. I. & P. R. Co. v. Broe, 16 Okl. 25, 86 P. 441; Texas & Pac. R. Co. v. Payne, 15 Tex. Civ. App. 58, 38 S. W. 366; State v. Smith, 31 Mo. 566; Cincinnati, N. O. & T. P. R. Co. v. Hansford, 125 Ky. 37, 100 S. W. 251 (in this case the evidence showed that the lost goods cost $317, and that, if they had been received and sold at retail, a profit of $105.66 would have been realized thereon; there was no evidence as to what their value would have been at destination, or that it would have been more than the cost price; on that ground, as stated in the opinion, a recovery was limited to $317, and prices at retail were disregarded); Quanah, A. & P. R. Co. v. Novit (Tex. Civ. App.) 199 S. W. 496.

15. For the reasons stated near the beginning of this opinion, judgment will be entered allowing plaintiff a recovery at the rate of $9.70 per ton for the coal which was lost.